128 N.J. Super. 438 (1974)
320 A.2d 223
OAKWOOD AT MADISON, INC., A CORPORATION OF THE STATE OF NEW JERSEY, BEREN CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, DOROTHY MAE SHEPARD, LOUVENIA ALSTON, WILLIAM BAYLIS, BRENDA SMITH, LIZZIE WALKER AND GERALDINE YORK, PLAINTIFFS,
v.
THE TOWNSHIP OF MADISON AND THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 29, 1974.
*439 Mr. Frederick C. Mezcy and Mrs. Lois Thompson, of the New York bar, admitted pro hac vice, for plaintiffs (Messrs. Mezey & Mezey, attorneys).
Mr. Richard F. Plechner, for defendant Township of Madison.
FURMAN, J.S.C.
Madison Township amended its 1970 zoning ordinance, effective October 1, 1973, between the decision of this court holding the 1970 zoning ordinance invalid (reported in 117 N.J. Super. 11 (1971) and the resolution by the Supreme Court (certif. granted, 62 N.J. 185 (1972)) of an appeal from that decision. The Supreme Court remanded to this court for a trial, retaining jurisdiction, in accordance with appellate procedural law that an appellate court determines the legal validity of the zoning *440 ordinance in effect at that time. Tidewater Oil Co. v. Mayor, etc., Carteret, 44 N.J. 338, 341 (1965).
This court held in the earlier decision that:
In pursuing the valid zoning purpose of a balanced community, a municipality must not ignore housing needs, that is, its fair proportion of the obligation to meet the housing needs of its own population and of the region. Housing needs are encompassed within the general welfare. The general welfare does not stop at each municipal boundary. Large areas of vacant and developable land should not be zoned, as Madison Township has, into such minimum lot sizes and with such other restrictions that regional as well as local housing needs are shunted aside. [at 20, 21]
The precedents relied on include Chief Justice Vanderbilt's opinion in Duffcon Concrete Products v. Cresskill, 1 N.J. 509, 513 (1949), recognizing regional needs as a proper consideration in local zoning. A zoning ordinance prohibiting heavy industry anywhere within the municipality was sustained in Duffcon, but only under the circumstance that "in the same geographical region, there is present a concentration of industry in an area peculiarly adapted to industrial development and sufficiently large to accommodate such development for years to come * * *." [at 515]
In Fanale v. Hasbrouck Heights, 26 N.J. 320 (1958) Chief Justice Weintraub, in upholding a prohibition by zoning ordinance against any new multi-family housing, noted:
There of course is no suggestion that the county is so developed that Hasbrouck Heights is the last hope for a solution, and hence we do not have the question whether under the existing statute the judiciary could resolve a crisis of that kind. [at 328-329]
DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 442 (1970), and Andrews v. Ocean Tp. Board of Adjustment, 30 N.J. 245, 251 (1959), recognized that the serving of regional as well as local needs by, respectively, public multi-family housing and a parochial school were "special reasons" supporting zoning variances under N.J.S.A. 40:55-39 (d).
*441 Presumptively, the Supreme Court would have recognized the general welfare as overriding and struck down the ordinances under review in Duffcon and in Fanale if, respectively, there had not been adequate industry or adequate multi-family housing nearby.
As a parallel, this court, finding desperate housing needs in the county and region, held that the Madison Township zoning ordinance was invalid because it failed to provide for the township's fair share of housing to meet the housing shortage. Whatever general welfare benefits might be served within the township by population limitations (the conceded objective), these were overridden and the general welfare in balance thwarted by exclusionary zoning restrictions against new low and moderate income housing.
Factually, a crisis in housing needs continues; most severe for those of low and moderate incomes, and a disadvantaged population remains trapped in the ghettoes of the central cities. The issue thus is whether the amended zoning ordinance of Madison Township provides for the township's fair share of new low and moderate income housing as well as of new high income housing.
Some preliminary clarifications may be appropriate. The region, the housing needs of which must be reasonably provided for by Madison Township, is in the view of this court, not coextensive with Middlesex County. Rather, it is the area from which, in view of available employment and transportation, the population of the township would be drawn, absent invalidly exclusionary zoning. Less than 1% of the Madison Township residents who are employed have their jobs within the township. But the township is bisected by arterial highways, including the Garden State Parkway, and by a commuter railroad with stations in adjoining municipalities. Access to employment even at some distance is practicable by automobile, bus and railroad. 50% of the work force is employed in Middlesex County, 15% in New York City, 10% in Essex County and the balance in nearby *442 New Jersey counties, including 7% in Monmouth County to the south.
In determining the township's fair share of housing in all income ranges, the breakdown of population by yearly income according to the 1970 census is relevant. Only 12% of the township's households (both families and persons living alone) had incomes below $6627, 19% had incomes from $6627 to $9936, 24% had incomes from $9936 to $13,088, 27% had incomes from $13,088 to $19,236 and 18% had incomes above $19,236, as compared in each quintile to 20% of the State's households. Unquestionably, high costs of commutation to work have tended to reduce the township's proportion of low-income earners below that of nearby urban and industrial centers.
Madison Township comprises approximately 25,000 acres. Its population is 8% of Middlesex County but its vacant developable land is nearly 20%, about 11,000[1] out of 56,000 acres throughout the county. Despite zoning restrictions which this court held invalid, the township's population upsurge continued from 1970 to 1973, up by 5000 or 11%. But only 6% of the building permits issued in the county were issued in the township during that period. Projected housing needs for the township are for 750 to 1000 units a year into the 1980's, 500 to 600 of those low and moderate-income units according to testimony on both sides.
The 1973 zoning amendments were extensive, enlarging both total acreage available for housing and housing capacity. Under the 1970 ordinance about 5,500 acres of vacant developable land were zoned R40 with one-acre minimum lot size, and about 2500 acres of vacant developable land were zoned R80 with two-acre minimum lot size. These totals were amended to about 4500 acres in R40, and 325 acres in R80. Minimum total floor space limitations in R40 and R80 were deleted; minimum floor space limitations per room *443 were established in all residential zones. An R15 zone was created with 15,000 square foot minimum lot size, on the outskirts of areas of high density population. The available land in R15 is about 500 acres. The R20 zone with 20,000 square foot minimum lot size was expanded by about 500 acres.
Cheesequake State Park; the Old Bridge sands, an underground water resource largely owned by the City of Perth Amboy; Burnt Fly Bog, the meadowlands adjacent to Deep Run, and the Raritan Bay beachfront were rezoned from R80 to RP, Recreation-Preservation.
Under the 1970 ordinance the multi-family housing zone, designated AF, was limited to a new housing capacity of about 700 units, with a bedroom per development ratio of 80% one bedroom and 20% two bedroom, and a maximum density of 12 units per acre. Both the bedroom ratio and maximum density restrictions were deleted by the 1973 amendments, which fixed a 10,000 square foot per acre maximum. Flexibility to meet varying demands, efficiency to multi-bedroom apartments, was the objective, according to the township planner. But the undisputed testimony was that builder's profits are maximized in apartment units with one or no bedroom. This court must therefore accept the forecast by plaintiffs' expert that, without a maximum unit density per acre, construction of efficiency and one-bedroom units will dominate.
The multi-family housing capacity available under the 1970 ordinance was realized by new construction in the intervening years. In 1973 three new AF districts were established and existing AF districts enlarged to a total of about 120 additional acres.[2]
New innovative techniques in planning and zoning were introduced by the amendments under review  planned unit developments (N.J.S.A. 40:55-54 et seq.) and cluster zoning *444 (N.J.S.A. 40:55-30 et seq.; Chrinko v. So. Brunswick Tp. Planning Bd., 77 N.J. Super. 594, 601 (Law Div. 1963)).
Three extensive areas near important highways, over 600 acres each, were zoned PUD. Two of the areas are not served by water and sewer utilities. Three options are available to PUD developers, Class I between 150 and 300 acres, Class II between 300 and 500 acres, and Class III above 500 acres. PUD tracts may be enlarged from adjoining districts by not more than 15%, within the discretion of municipal authorities. PUD approval procedure is protracted  up to one year in the estimate of the township planner.
Class I PUD must have 30% detached single-family houses, Class II 17.5% and Class III 12.5%. Single-family lot sizes must average 15,000 square feet with a minimum of 12,000 square feet. Multi-family housing is allowed (garden apartments and townhouses or attached single-family houses), in all PUD classes, and high-rise, high-density apartments up to seven stories high in Classes II and III. The maximum housing units per acre are 3 1/2 in Class I, 4 1/4 in Class II and 5 in Class III, with reductions if streets, water or sewer utilities must be built. Minimum percentages of total land area are fixed for commercial, other nonresidential and community service uses, including schools to be built by the developer, and for developed and undeveloped open spaces.
Cluster zoning is optional as an incentive to higher density development in the R40 and R 80 zones, and in the RP zone contiguous to R40 or R 80. Cluster development limits are 25 acres to 150 acres. 20% must be common open space. Another 20% may be dedicated for public purposes with the consent of the developer, allowing him to reduce minimum lot sizes for detached single-family houses from 18,000 to 12,000 square feet in R40 and from 36,000 to 18,000 square feet in R80. Townhouses may be built only in R40, and only if the developer has dedicated 20% of total land area for public purposes. The density limits without a dedication for public *445 purposes are 1 1/3 times normal density of one acre in R40 and 1 2/3 times normal density of two acres in R80. The density limits increase according to a formula based on the percentage of land dedicated for public purposes; for example, to 1 2/3 times normal density in R40 and twice normal density in R80, if 20% has been so dedicated.
Computation of additional housing capacity available under the 1973 amendments must be guesswork because of uncertainty about the utilization of the R40 and R80 cluster options, whether any utilization at all and, if so, according to what development patterns. PUD and AF housing potential also will hinge upon development patterns among various alternatives.
The township planner projected an additional housing capacity of about 15,000 units providing for an additional population of 47,000 as a result of the zoning changes in 1973. His estimates are creditable except as to R40. Even with substantial utilization of the cluster option the additional population potential in R40 should be no more than 10,000 rather than the township planner's estimate of 18,000.
Significantly, the township planner conceded that there is virtually no potential for low-income housing and no incentives in the ordinance or amendments to build low or moderate-income housing. He defined low income as up to $7000 a year, and moderate income as up to $10,000 a year.[3] In those categories, in his view, a family can afford to buy a dwelling at twice annual income or pay rent of about one-fourth annual income. He testified to some moderate-income housing potential in PUD Class II garden apartments and townhouses (about 10% within reach of moderate-income families), but not in PUD Class II and Class III high-rise apartments. Garden apartments and townhouses in R40 clusters, and one-bedroom apartments in AF, would be economically *446 feasible, in his estimate, for about half the State's households; new single-family houses in R15 and R20 for about 30%.
To recapitulate, the high-density R7 and R10 zones are largely developed at present but would provide about 1500 new housing units, including two-family houses in R7, open to moderate but not low-income. Some moderate income condominiums may be built in the AR zone, multi-family housing for senior citizens, which has about 65 acres available for development. New single-family housing in the R15 and R20 zones is barred by prohibitive costs to about 70% of the State's households, in the PUD zone, and in the R40 and R80 zones, in clusters, to about 80%, and in the R40 and R80 zones, not in clusters, to about 90%. Households with average incomes are at the lower limit of those who can afford multi-family housing in PUD Class II, R40 clusters and AF. While uncertainty exists as to the number of new multi-family housing units for moderate income which may be built in these zones, an overall projection of 10%, or 1000 to 1500 units, is realistic.
Of the total 20,000 to 30,000 housing units which may be built in Madison Township under the 1970 zoning ordinance as amended, about 3500 at most would be within the reach of households with incomes of $10,000 a year, the upper limit of moderate incomes, and virtually none within the reach of households with incomes of $9000 a year or less. This contrasts with the present township population, approximating 12% low income and 19% moderate income. Of the vacant developable land in residential zones over 80% is zoned R40 and R 80, only about 4% R7 and R10.
The zoning objective in 1970 of an elite community of high income families with few children is maintained by the 1973 amendments. The advances towards moderate-income housing opportunities are token, towards low-income housing opportunities nil.
The township asserts that because of high land and construction costs zoning for low-income single-family housing *447 is impossible. Even without governmental subsidies, however, multi-family housing may be provided for low and moderate-income families. Incentives may be set, such as extra density for low and moderate-income units. Low and moderate-income single-family housing is an illusion on one and two-acre lots, a hope on 7500 to 15,000-square-foot lots.
Without the rigidity of a mathematical formula this court holds that Madison Township's obligation to provide its fair share of the housing needs of its region is not met unless its zoning ordinance approximates in additional housing unit capacity the same proportion of low-income housing as its present low-income population, about 12%, and the same proportion of moderate-income housing as its present moderate-income population, about 19%. The amended zoning ordinance under review falls palpably short and must be struck down in its entirety.
No opinion is rendered as to ecological and environmental factors apparently justifying the RP, R80 and to some extent R40 zones. The record on ecological and environmental factors was meager before the municipal authorities, but extensive depositions relevant to these subjects were stipulated into the record before this court. Concededly, ecological and environmental problems have no bearing except in Burnt Fly Bog, the Old Bridge sands, Raritan Bay beachfront, the salt marshes back of Raritan Bay and the four water courses running northwesterly through the township into South River. Ample land ouside these areas is available, including specifically the AF districts and their environs and much of R40, within which the township can meet its obligation to provide its fair share of its own and the region's housing.
Judgment for the plaintiffs.
NOTES
[1] An aerial photography study suggests that this acreage estimate should be revised downward.
[2] Exclusive of large single-family tracts in AF, which may be subdivided.
[3] The Director of County Planning estimated moderate income as up to $12,000 a year.