688 A.2d 1125

SOD FARM ASSOCIATES, PLAINTIFF, v. THE SPRINGFIELD TOWNSHIP PLANNING BOARD, IN THE COUNTY OF BUR-LINGTON, A MUNICIPAL ENTITY, AND THE SPRINGFIELD TOWNSHIP COUNCIL, IN THE COUNTY OF BURLINGTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JER-SEY, DEFENDANTS.

Superior Court of New Jersey
Law Division Burlington County

Decided November 8, 1995.

*Lewis Goldshore* for plaintiff (*Goldshore, Wolf & Lewis,* attorneys).

*Dennis P. McInerney* for defendant, Springfield Township Council (*McInerney & Caniglia,* attorneys).

*Denis C. Germano* for defendant, Springfield Township Planning Board (*Hulse & Germano,* attorneys).

WELLS, III, A.J.S.C.

This is an action in lieu of prerogative writ to overturn certain actions of the Springfield Township Governing Body and the Township's Planning Board. Before the Court are cross motions for summary judgment relating to Counts One, Two, Three Five and Six of the Third Amended Complaint. The specific complaints relate to the Township's refusal to include the plaintiff's property in the Township's Wastewater Management Plan (WMP), an action which effectively denies the property access to sewer service; its repeal of certain favorable density provisions contained in the zoning ordinance; and, finally its adoption of three acre zoning for residential development within the Township.

In order to assess these actions and to evaluate plaintiff's claims which allege that the Township's actions are unlawful zoning and planning regulations which arbitrarily and unreasonably hamper the development of its property and may effectively "take" its property, it is necessary to trace the planning background of Springfield Township to put them in context. The Court has been provided with the Township's Master Plan of 1988 and the "Reexamination" thereof dated December 21, 1993. Both of these documents were alluded to by the parties in their briefs and argued extensively at the hearing on the motions.

The 1988 Master Plan found that:

Springfield Township is a rural community with a long history of agricultural uses. . . .

Springfield Township, a largely rural area, offers little in the way of a striking or unique element within its landscape. The vast acreage of rolling farmland coupled with scattered wooded area and a number of stream waterways do, however, offer a quietly scenic and interesting environment to those seeking the advantage of a pleasant countryside. 1988 Master Plan, page 4-1.

In view of these findings, it is no wonder that the following objectives of planning in the Township found expression among the top three:

1. To maintain the rural character of the Township but recognize the requirements of several laws that pertain to development. . . .

3. To preserve farmlands, woods, streams and the natural areas that presently characterize the Township. *Id.* page 3-1.

On the idea that actions speak louder than words, the Township also submitted a certification by Cindy Gillman, a senior planner in the Burlington County office of land use planning whose primary responsibility is the administration of the County's farmland preservation program. She points out that Springfield ranks third in term of acres preserved with 1,077 but second in terms of money spent, $5,583,234, over $550,000 of which is the local taxpayers' share. She further states: "... we are on the threshold of enrolling eight (8) more Burlington County farms, totalling 1,328 acres in the program. Two (2) of these farms totalling 205 acres are located in Springfield.... Finally, we are in preliminary negotiations with two more Springfield farms consisting of an additional four hundred (400) acres." Defendant Springfield's Appendix, Exhibit 8.

At the same time it must be recognized that Springfield was not interested in choking off commercial development. The 1988 Master Plan said:

> U.S. Highway Route 206 is a four lane highway extending in a north-south direction through the center of the Township. It has convenient access to Route 130, Route 295, and the NJ Turnpike at Bordentown and intersects Route 30 at Hammonton. Route 206 is the primary traffic corridor for Springfield.... 1988 Master Plan, page 4–6.

> Route 206 is the main artery for traffic connection to other portions of the State.... *Id.* 4–10.

> The major asset of Route 206 and the lack of public transportation facilities suggests that the area should be reserved for commercial and industrial uses consistent with the environmental constraints of the land. *Id.* 14–2.

To that end the plan proposed "that smaller lot commercial development would be concentrated near intersecting streets with access to the cross road. In that manner, easy access could be made to Route 206 but the points of conflict would be minimized. In the areas between intersections, larger lot commercial and industrial development would be permitted." *Id.* 4–11. The plan included a proposed zoning map which preserved a wide area for commercial development on either side of Route 206.

Consistent with these planning ideas, the Township's zoning ordinance, prior to the actions complained of in this case, created

an R–1 district which not only permitted farming but also allowed housing on lots not served by public sewer and water systems of 40,000 square feet (one acre). Z.O. sect. 81.17F. The ordinance also awarded a bonus density if sewer and water were present:

> If public sewer and water are available and utilized, lots in the R–1 Zone can be 20,000 SF ... If public water is also utilized, residential lots can be 15,000 SF.... Z.O. Sect. 81–17H.

The ordinance also created C–1 and C–2 commercial zones in a wide swath around Route 206. It required public sewer and water for commercial development. Z.O. Sect. 81–24.

Thus matters stood from a planning prospective until 1991 when a major housing developer, Toll Brothers, with plans to build in Mansfield Township, a municipality to the north of Springfield, formally asked Springfield's Planning Board to approve a plan whereby its developments could connect to the Mount Holly sewerage treatment plant situated to the south of Springfield via a sewer main running along the 206 corridor through the Township. This plan was initially, at least, looked upon with favor by Spring-field officials, particularly because the entire cost of the extension would be borne by Toll Brothers and, as well, because it was a way of opening for development the commercial areas along 206. In fact, the Planning Board endorsed the proposal in connection with preparation of a WMP, submission of which is required by law upon the extension of sewer lines in a municipality. *N.J.S.A.* 58:11A–1 *et seq.* and regulations promulgated thereunder *N.J.A.C.* 7:15–1.1; and see Plaintiff's Exhibits 18 and 19. At this point, enter the Plaintiff.

Sod Farm Associates is and has been for ten years the owner of a large tract of land in Springfield Township. About 176.8 acres of its property along 206 are located in the Township's zoning districts C–1 and C–2. Its remaining 461 acres are located in the R–1 district. As its name implies, plaintiff raises sod for commercial sale. Stymied by the lack of sewer for years, Sod Farm now perceived a golden opportunity to develop its lands and began to press for inclusion of its property in the WMP. One early 1992 draft WMP did include plaintiff's commercial acreage. Plaintiff's

Exhibit 20. But in July 1992 plaintiff appeared before the Planning Board with a plan for the development of the residential acreage into small lots under the density bonus and requested the Board to include its residential acreage in the WMP as well. It told the Board on good authority that the Mount Holly sewer treatment plan had the necessary capacity.

The first reaction of the Board was to suggest that more of plaintiff's acreage be zoned commercial. A "Highway Commercial" ("HC") Zone was tentatively proposed. But then matters slowed while the Township collectively rethought its position on the whole idea of the proposed sewer extension along 206. There were continuing discussions about the proposal at meetings in the Fall of 1992 which culminated in an extended debate on the subject at the Board's meeting of February 2, 1993. Defendant's Appendix, Exhibit 13. That same day, notice had been received that Toll Brothers had abandoned its plans to develop in Mansfield; nevertheless, Plaintiff made an offer to build the sewer extension at its own cost. By March 1993 the Planning Board changed its mind and decided to recommend that none of the Route 206 corridor be sewered. It did recommend that two other small areas of the Township (one of them an area zoned for low and moderate income housing approved by COAH) and no others be included in the WMP. The transcript of a meeting held on March 2, 1993 has been supplied to the Court, Defendant's Exhibit 14, during which the issue of inclusion of plaintiff's property in the WMP was again discussed and a unanimous vote taken against the proposition.

In April 1993, the Board adopted a formal resolution embodying the decision. That resolution which bears careful examination said in relevant part:

6. It must be said that this Board's and this Township's vision for the development of Route 206 as expressed in the 1988 re-examination of the Master Plan and the implementing Ordinances that followed later that same year require the installation of sanitary sewer. Why then does this Board recommend that the governing body deny a request that would further our stated goals for the development of this area? Resolution 1993-2, Plaintiff's Appendix, Exhibit 6.

The Board in several paragraphs thereafter gives essentially three answers to the question it posed itself. First, it mentions the adoption of the 1992 State Development and Redevelopment Plan and its meaning for Springfield. In Paragraph 7 and following paragraphs of its reasons the Board states:

7. The State Plan classifies Springfield Township as a "Rural Planning Area". The Plan's goal for land use in rural and developing areas such as this is to prevent sprawl development by clustering growth into existing and planned towns, villages and hamlets and preserving large contiguous masses of farmland and open spaces; or, to quote from the Plan

"The following set of policy objectives are unique to the Rural Planning Area and should be used to guide the application of the State Plan's Statewide Policies ...

(1) Land Use. Enhance agricultural vitality and rural character by building development and redevelopment into Centers. Insure that the location, pattern and intensity of any development in the Environs maintains existing low density development patterns that compliment the rural character and landscape and maintain large areas of open space. Any development in Planning Area 4 should be designed using creative land use and design techniques to ensure that it does not conflict with agricultural operations, does not exceed the capacity of natural and built systems and protects areas where past public investments in farmland preservation have been made.

8. Through the cross acceptance process, the State Plan identifies four existing "centers" in Springfield Township; one "town" consisting of Wrightstown Borough plus parts of Springfield and North Hanover Townships (the COAH certified area), two villages, Juliustown and Jobstown, and one existing hamlet, Jacksonville.

9. The sod farm property is not identified as an existing or proposed "center", nor is Route 206 itself designated as a growth corridor. Seen in terms of the State Plan, then, the Sod Farm request is not simply to include its property in the Wastewater Management Plan, but to designate the Route 206 corridor, or at least a portion of it, as a "planned, or proposed center." *Id.*

The second reason it gives is the following:

14. This is a realization by the Board that perhaps its vision for the commercial/industrial development of Route 206, which cannot take place without public water and sewer, is not only inconsistent with the State Plan but inconsistent with its own stated goals of preserving farmland and the rural agricultural character of the community. *Id.*

And finally the Board harkens back to the 1988 Master Plan's emphasis on the rural character of the Township and the prime objective of encouraging farming as a viable industry in the Township. The resolution specifically states:

13. A recent study by the Burlington County Land Use Office indicates that about 75% of the land area of the Township ± 15,000 out of ± 19,000 acres, is qualified

farmland. First and foremost among the planning goals of this Board, as stated in our 1988 Master Plan re-examination report is to preserve:

(a) the resource that is productive agricultural land and

(b) the rural/agricultural character that this resource gives to the municipality as a whole.

The Board fears that bringing public water and sewer from a large public utility with hundreds of thousands gallons of excess treatment capacity to the geographic center of the municipality will lead to what the State Plan calls "sprawl development" and the destruction of the Township's most valuable natural resource, ± 15,000 acres of productive farmland and the rural agricultural/character which it imparts to the community as a whole. *Id.*

The Court has reviewed the transcript of the meeting of March 2, 1993 and each of these points was raised and discussed. Suffice it to say that the Board's recommendation was passed to the governing body which approved it and submitted it to DEP.[1] The Board also, incidentally, recommended that a periodic reexamination of the Master Plan be initiated under the MLUL. *N.J.S.A.* 40:55D–89.

It is abundantly clear that the Board and the governing body realized the inconsistency of what it had done respecting the WMP as it related to plaintiff's property. To deny plaintiff's property access to sewer clearly conflicted with the 1988 Master Plan and with the zoning ordinance, both of which linked development of residential and commercial zones to the availability of sewer. Springfield acted to clear up these inconsistencies. In successive actions which applied to the entire Township, not just plaintiff's property, the Board adopted Ordinance 1994–6 [2] (July 13, 1994) which repealed the density bonus, see *supra* page 87, 688 *A.*2d page 1127, where public sewer was available. In early 1995 it

---

[1] The DEP has not as yet approved the WMP. In a prior motion Springfield sought summary judgment as to plaintiff's allegations respecting its refusal to include plaintiff's property in the WMP on the ground that the Court had no jurisdiction while the matter was pending before the DEP. The Court in a letter opinion dated May 26, 1994 rejected that claim and denied summary judgment.

[2] This ordinance supplanted the virtually identical Ordinance 1993–8 which passed in September 1993 but which was defective because it was not reviewed by the Planning Board. *N.J.S.A.* 40:55D–64; *N.J.S.A.* 40:55D–26.

raised the lot size in the R–1 Zone to three acres. These actions were preceded by the adoption of the Master Plan Reexamination on December 21, 1993 with the formal resolution coming on February 1, 1994. The justification for the actions are found in the Reexamination and in the Planning Board reports on the ordinance changes. Excerpts follow:

The Reexamination report contained the following statement of goals and objectives:

### Goal Statement

The central goal and focus of this Master Plan is to preserve and promote the viability of the local agricultural economy and the rural character which farms and farming lend to the Township as a whole and to insure that future development in Springfield Township is consistent with the goals and objectives of the State Development Redevelopment Plan.

### Objectives

1. To manage and control growth and development in such a way as to preserve and protect the Township's physical environment and natural resources, especially productive agricultural land.

2. Encourage farming to remain the predominant land use in Springfield Township. Create an atmosphere conducive to the economic well-being of the agricultural industry by minimizing or eliminating conflicts between development and agricultural operations, encouraging investment in agriculture, creating opportunities for new generations of farm families to stay on the land and protecting the farmer's equity.

To this end the Land Use Element stated:

As may be garnered from the introduction and the goal and objectives, preservation of agriculture and control of growth in Springfield Township will drive future land use decisions. To implement the goal and objectives, a way must be found to restrict development opportunities in existing agricultural areas. Implementation must also encourage residential and nonresidential growth in areas adjacent to existing and planned population centers in Springfield and adjacent to areas in other municipalities that are slated for growth of this kind.

In a June 21, 1994 report to the Governing Body from the Planning Board on the advisability of repealing the density bonus provisions of Ordinance Section 81.17H, the Board stated:

Chapter 81.17H of the zoning ordinance is a verbatim repetition of this master plan recommendation. It is consistent with the 1988 master plan. An ordinance (like ordinance 1994–6) that repeals it is not. Inconsistency with the 1988 master plan is not, however, fatal to the ordinance. Why? There are two reasons. First,

because the municipality's most recent policy statements about its future development are stated, not in the 1988 plan, but in the 1993 re-examination report. Second, because significant changes in the law occurred in the years after the 1988 plan was adopted. Please bear with some elaboration on this second point.

The Council adopted ordinance 1993–8 at the recommendation of this Board in an effort to keep our zoning ordinance consistent with our recently adopted Wastewater Management Plan. The Council has now introduced ordinance 1994–6 to make that consistency complete. Why has the Planning Board only recently tried to coordinate our zoning ordinance and our wastewater management plan? Why wasn't this done when we adopted our 1988 plan? Because in 1988 municipalities did not prepare wastewater management plans! Municipalities were not given wastewater management planning responsibility by the NJDEPE until October of 1989, almost two years after our 1988 master plan was adopted and more than one year after we completed the last major revision of our development regulations i.e. zoning, subdivision, and site plan ordinances.... Defendant's Appendix, Exhibit 3, pages 2–3.

Similarly, in its report to the Governing Body on Ordinance 1995–1 which raised the lot size in the R–1 zone to three acres the Board said:

We have examined the proposed Ordinance and have concluded that it is entirely consistent with and designed to implement our latest Master Plan re-examination report and the Township's Wastewater Management Plan.

The Ordinance is designed to accomplish two goals. The amendments to Sections 22.5–3, 22.6–4, and Schedule I, the "schedule of area and bulk regulations" and the repeal of sections 22–6.5(f), part of (g) and all of (h) are all designed to implement the Planning Board's recommendation that our minimum lot size be increased to 3 acres.

Our reasons for this recommendation are well known to the Council, but need to be stated for the record. Our Master Plan re-examination report adopts and incorporates the goals and objectives of the State Development and Re-development Plan for this area, which is to preserve our rural atmosphere by promoting agriculture and preserving our most abundant natural resource, productive farm-land.

Our ability to achieve this goal is threatened by the connection of the North and South sections of I–295 in Bordentown just north of us on Route 206. Compounding this problem is the fact that our neighbors to the north, Florence, Mansfield, Chesterfield and North Hanover Townships have all adopted a minimum lot size of 3 acres. If Springfield retains one acre zoning under these circumstances, it will become a target for development pressure moving in this direction from the North.

The same is true of development pressure coming from the South. The land adjoining Springfield Township in Eastampton and Pemberton Township is zoned for development at a density of 1 unit for every 6 acres. Westampton and Burlington Townships are zoned for one acre building lots.

> This Board recognizes that downzoning is not the vehicle that will accomplish our long range goal of farmland preservation. But, relative to most of its neighbors, Springfield is now one of the most profitable places for developers to build. This fact will attract development to Springfield and result in the loss of more productive farmland than might otherwise be the case. This result is clearly contrary to our Master Plan. Defendant's Appendix, Exhibit 4, pages 1–2.

In its six Count third amended complaint, plaintiff alleges all the above actions of Springfield are legally defective, unconstitutional and arbitrary, capricious and unreasonable. In Count I it asserts that the refusal to include its property in the WMP is "fiscal zoning" and "spot zoning". In Count II it claims the said refusal is inconsistent with the Water Quality Planning Act. *N.J.S.A.* 58:11A–1 *et seq.* In Count III it alleges that the same refusal is an unconstitutional deprivation of substantive due process. Count IV (not presently before the Court on these motions) alleges that Springfield has taken its property without compensation and seeks condemnation thereof. In Count V plaintiff claims that Ordinance 1994–6 is procedurally defective and constitutes spot zoning. Finally, in Count VI similar charges are made with respect to Ordinance 1995–1.

Consideration of these claims as presented in the briefs and exhibits and as argued on the return day of the motions lead the Court to conclude that plaintiff's challenges to all of Springfield's actions center around three points. First, it urges that the Court look through the formal paper trail of resolutions left in the wake of Springfield's actions and examine what emerges as the true motivations behind these actions. Second, it claims certain technical and procedural deficiencies in the actions. Finally, it seeks to convince the Court that Springfield's current policy violates existing zoning and planning policy and law. It is with these issues that the Court will now deal.

Plaintiff's invitation to look behind the formal actions of the Township and into its true intent is supported by plaintiff's allusion to eight statements made by persons including members of the planning board during public meetings. Plaintiff claims that these statements are a sampling of others in a similar vein

made throughout the proceedings. Three of the samples are from transcripts dated in March, April and September of 1990. Plaintiff's Exhibits 26, 29 and 28. Although the context of the statements is not entirely clear, I infer that they are made in connection with early, informal, consideration of the Toll Brothers' request to run a sewer line down Route 206. Nevertheless, it is important to quote a few of the statements to get a flavor of what the plaintiff is contending. Planning Board Chairman Schettler says:

> And if you can get the sewer without creating a nightmare and apartment projects and things like that, demanding services, things like that, like Burlington Township. . . .

> Member Poinsett: I don't know of any residential unit that, for the average family, that will make any money for you, it will cost you money. . . .

> Member Ziegler: Now I don't want to push cluster housing and all that sort of thing, because that means youngsters and that means education and that's an expensive item. . . .

On March 5, 1991 during a discussion of the Toll Brother's specific proposal, Chairman Schettler said:

> One of the drawbacks if we don't put the comprehensive zoning plan in effect is that yes, we take advantage of a sewer, a free sewer through the town, we get a few people hooked up on Jacksonville Road, that's really not a big issue, and if we do not put the comprehensive plan into effect, we have a potential to think kindly of this proposal now, but then conceivably get hundreds upon hundreds of little gremlins, right, which generate excessive cost over here. Then you have, you know, human next to human problems of police and all types of grief, . . . Plaintiff's Exhibit 27.

About a month later an unidentified speaker says:

> Everyone seems to agree that we are not really interested in sewering the residential areas, because that will bring along fast growth and high taxes, bigger schools. Plaintiff's Exhibit 25.

During the February 1993 meetings of the Planning Board in which the very issue of including plaintiff's property in the WMP was before it, Member Petrino stated:

> They [Sod Farm] made no mention, whatsoever of donating a school building on . . . site, because if those are single-family homes or if they're multi-family units, they are going to produce quite a, quite an additional amount of school children, and although the current school is down from last year's population, it can't, it could not absorb that. Plaintiff's Exhibit 30.

... because they're already proposing townhouses and condominiums of 400 and some homes, which we don't want because they're not proposing giving the Township a school. They're not proposing where the taxes are going to come from to pay for all the teachers and the educators and ... and the equipment and stuff that that would mean ... Plaintiff's Exhibit 31.

It has been true for over twenty years that so-called "fiscal zoning" is improper. *Oakwood at Madison, Inc. v. Tp. of Madison,* 117 *N.J.Super.* 11, 14, 18, 283 *A.*2d 353 (Law Div.1971), *on remand,* 128 *N.J.Super.* 438, 320 *A.*2d 223 (Law Div.1974), *modified on other grounds and aff'd* 72 *N.J.* 481, 371 *A.*2d 1192 (1977) (holding that the enactment of zoning regulations for the specific purpose of curbing population growth significantly in order to stabilize the tax rate is an improper zoning consideration); *Molino v. Mayor and Council of Bor. of Glassboro,* 116 *N.J.Super.* 195, 201, 281 *A.*2d 401 (Law Div.1971) (holding that the attempt to limit the cost of education by limiting the number of children allowed in a project or a community is an improper zoning consideration).

Plaintiff, pointing to the statements quoted above, and characterizing the formal resolutions and reports as pretextual coverups of its true intent to stifle housing because of the attendant costs and increased taxes, calls the actions of the Township worse than those of Long Beach Township in the case of *Riggs v. Long Beach Township,* 109 *N.J.* 601, 538 *A.*2d 808 (1988). In that case the issue before the Court was whether an ordinance which effectively reduced the number of lots in a tract of property along the Bay in Brant Beach and which in practical effect applied only to Riggs had been passed for a valid purpose. The Court went on to find that it was not, concluding that the Ordinance in question was passed "to reduce the value of the Riggs' property so that the municipality could acquire it below fair market value." *Id.* at 604, 538 *A.*2d 808. While the record in that case was replete with the official actions of the town, the result hinged on certain trial testimony of the mayor which clearly demonstrated that there was no *bona fide* zoning purpose for the ordinance other than to reduce the price of Riggs' tract for acquisition by the Township. *Id.* at 608–609, 538 *A.*2d 808. But in ruling as it did, the Court set forth a very significant principle:

In determining whether the ordinance was adopted for an unlawful purpose, we distinguish between the purpose of the ordinance and the motives of those who enacted it. Courts generally will not inquire into legislative motive to impugn a facially valid ordinance, but will consider evidence about the legislative purpose "when the reasonableness of the enactment is not apparent on its face." Although the distinction between motive and purpose can be fuzzy, "motive" ordinarily addresses the subjective considerations that move a legislature, and "purpose" speaks to the goals to be achieved. *See also* Black's Law Dictionary 914 (defining "motive" as "[c]ause or reason that moves the will and induces action" and 1112 (defining "purpose" as "[t]hat which one sets before him to accomplish; an end") (5th ed.1979). The determination of "purpose" depends on objective factors, such as the terms of the ordinance and its operation and effect, as well as the context in which the ordinance was adopted. *Developments in the Law*, 82 *Harv.L.Rev.* 1065, 1091 (1969).

[6, 7] If an ordinance has both a valid and an invalid purpose, courts should not guess which purpose the governing body had in mind. If, however, the ordinance has but one purpose and that purpose is unlawful, courts may declare the ordinance invalid. Hence, when a party challenging an ordinance asserts that it was adopted for the improper purpose of depressing the value of the property in a condemnation proceeding, the court may seek to ascertain the municipality's true purpose in enacting the ordinance. This inquiry should be limited to an evaluation of the objective facts surrounding the adoption of the ordinance.

The Court finds that it is inappropriate to overrule the actions of Springfield based upon the motives of the officials who voted in favor of the questioned actions. In this case there is a clearly expressed and proper zoning purpose both in excluding Plaintiff's property from the WMP and in the zoning amendments Springfield enacted in the years following. That purpose is the preservation of both a rural lifestyle and agriculture as an economically viable business. *N.J.S.A.* 40:55D–62. *See generally, Gardner v. N.J. Pinelands Com'n.*, 227 *N.J.Super.* 396, 547 *A.*2d 725 (Ch.Div.1988), *aff'd* 125 *N.J.* 193, 593 *A.*2d 251 (1991). Where at least one such purpose is substantially supported by the record, it is irrelevant that a few persons spoke of improper motives. Springfield's long history as a rural township; its existing substantial acreage in farmland; its Master Plan of 1988 and 1993 which hold the preservation of farming high in its scale of zoning objectives; its contributions in dollars and in acreage to the County farmland preservation program; and its designation in the recently completed State Development Plan as a "Rural Planning Area" all strongly buttress the Board's conclusion that preserving

and maintaining agricultural lands is a significant zoning and planning policy initiative and not simply a pretextual argument to exclude housing. *Gardner, supra.* This is especially true where the Township has zoned an area for its COAH allocation of low and moderate income housing and, by inclusion of that area in the WMP, made such housing practical.

■ Secondly, the Court rejects the technical attack on the Township's actions. First, I conclude that its action in declining to include the Plaintiff's property in the WMP does not violate the Water Quality Act and its implementing regulations. Generally, those regulations provide that a wastewater management plan should provide wastewater services for land uses allowed in the zoning ordinance or reasonably contemplated by the master plan. *N.J.A.C.* 7:15–5.18(b)1 and 2. But under *N.J.A.C.* 7:15–5.18(b)8, WMPs may be inconsistent with zoning ordinances or master plans "for other compelling reasons" if the inconsistencies are identified and justified with reasons based upon adequate documentation. Here, in my opinion, the Board, in its resolution of April 1993, paragraph 6, *supra,* page 89, 688 *A.*2d page 1128, identified the inconsistency of what it was doing and amply documented the reasons for so doing, *supra,* pages 89–91, 688 *A.*2d pages 1128–29. Furthermore, given the Master Plan, denial of sewer access cannot be deemed unreasonable or arbitrary.

■ Nor were the later zoning changes either unreasonable or inconsistent with the Master Plan. By the time the zoning ordinance changes were made in 1994 and 1995, the Township had completed its master plan review. That review accorded a much greater emphasis upon the preservation of rural life and agriculture in general than had the 1988 plan, although even there preservation of agriculture was a prime consideration in the future development of the Township. Thus, the changes made in eliminating the density bonus and raising the lot size throughout the Township were consistent with the newly revised master plan. *N.J.S.A.* 40:55D–62. This is true even though all of the changes may have been discussed, debated, evaluated and perhaps even

fairly well decided upon *before* the Master Plan Review was completed and passed. Developers have no right to insist that a Township's thinking and action on a difficult planning issue must proceed entirely in the abstract or in any kind of rigid order. Impetus to alter the zoning ordinance may come from citizens, the Planning Board or the Zoning Board, and decisions to change a zoning ordinance may become important to implement before the master plan can be reviewed and changed. It is clear that inconsistencies thus created by the amendment process are not fatal to a zoning ordinance where they are adopted by an affirmative vote of a majority of the full membership of the governing body and reasons are given in the resolution and recorded in the minutes. *N.J.S.A.* 40:55D–62a.

Finally, plaintiff contends that the newly enacted zoning amendments are not consistent with the Township's stated policy to preserve agriculture. The Township concedes this point to some extent. Three acre zoning is not, in fact, ideal to preserve farmland. What is created are large lot subdivisions with big, expensive houses and the very deterioration of agriculture which the Township seeks to preserve. *See generally, Gardner v. N.J. Pinelands Com'n.* 227 *N.J.Super.* 396, 547 *A.2d* 725 (Ch.Div.1988), *aff'd* 125 *N.J.* 193, 203–204, 593 *A.2d* 251 (1991). Pollution may increase as the result of the need to install septic systems. But at the same time, such zoning arguably brings the Township more in line with land use elements in zoning ordinances in surrounding municipalities and thus removes it as a target for smaller lot development detrimental to preservation of the rural ambiance of the Township. *See* Planning Board's report, cited page 93, 688 *A.2d* page 1131, *supra.* Springfield argues that it conceives its present three acre zoning as an interim measure designed to permit it to study and adopt plans which will better balance plaintiff's desire to develop its lands with the Township's goal of remaining rural. The Court notes, however, that the Governing Body recently rejected a plan permitting "Transfer Development Rights" within Springfield. Other ideas may be given consider-

ation, *see generally Gardner, supra,* (holding that 40 acre zoning and directing clustering of houses on one acre lots was not unreasonably restrictive in order to preserve farmlands within the Pinelands), but in any event the Court cannot for these reasons substitute its judgment for that of the Township. Three acre zoning is not inherently unreasonable, given the rural character of Springfield where it is not being used to deny opportunities for low and moderate income housing under *Mount Laurel;* and, where there is an economically viable use which may be made of the land. *Gardner, supra.*

For all of the above reasons, the Court concludes that Springfield has not acted in an arbitrary, unreasonable or capricious manner with respect to its actions regarding plaintiff's lands and, therefore, grants its cross motion to dismiss the various Counts of the Third Amended Complaint recited above. Accordingly, the motion of the plaintiff is denied.