700 A.2d 884

COUNTY OF MORRIS, PLAINTIFF–RESPONDENT, v. RIVERVIEW CONDOMINIUMS, INC., NEW JERSEY PUBLIC ADVOCATE, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MORRIS COUNTY FAIR HOUSING COUNCIL AND TOWNSHIP OF MORRIS, DEFENDANTS–RESPONDENTS, AND COLLINSVILLE CIVIC AND IMPROVEMENT LEAGUE, DEFENDANT–APPELLANT.

COUNTY OF MORRIS, PLAINTIFF–RESPONDENT, v. RIVERVIEW CONDOMINIUMS, INC., NEW JERSEY PUBLIC ADVOCATE, MORRIS COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, MORRIS COUNTY FAIR HOUSING COUNCIL AND COLLINSVILLE CIVIC AND IMPROVEMENT LEAGUE, DEFENDANTS–RESPONDENTS, AND TOWNSHIP OF MORRIS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 24, 1997—Decided September 23, 1997.

Before Judges HAVEY, BROCHIN and KESTIN.

*Lenora M. Lapidus* argued the cause for the Collinsville Civic and Improvement League, appellant in A–4420–94T2 and respondent in A–5203–94T2 (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Ms. Lapidus* and *Lawrence S. Lustberg,* on the brief).

*John M. Mills, III* argued the cause for the Township of Morris, respondent in A–4420–94T2 and appellant in A–5203–94T2 (*Mills & Mills,* attorneys; *Charles T. Hock* and *Mr. Mills,* on the brief).

*Edward J. Buzak,* Special Counsel, argued the cause for the County of Morris, respondent in A–4420–94T2 and A–5203–94T2, (*Ronald Kevitz,* Morris County Counsel, and *Mr. Buzak,* attorneys; *Messrs. Buzak and Kevitz,* with *Debra S. Weisberg,* on the brief).

No briefs were filed by any other party.

The opinion of the court was delivered by

KESTIN, J.A.D.

The Collinsville Civic and Improvement League (League) and the Township of Morris (Township), defendants in separate actions brought by the County of Morris (County), appeal from a judgment entered by the trial court on March 18, 1995. We consolidate the appeals for the purposes of this opinion. The issues on appeal were adjudicated by the trial court in an order entered on October 31, 1994, but other questions remained to be addressed before the matter could be considered final and ripe for appeal. *R.* 2:2–3(a)(1).

The issues on appeal have their genesis in an exclusionary zoning suit against the Township. That matter was settled in 1984 with the entry of a final judgment of compliance pursuant to *Southern Burlington County N.A.A.C.P. v. Mt. Laurel Tp.,* 92 *N.J.* 158, 350–51, 456 *A.*2d 390 (1983) (*Mt. Laurel II*). That final

judgment was based upon an earlier court-approved settlement. The judgment established the Township's fair share of the regional need for affordable housing for six years, into 1990, subject to the Township's obligation then to "assess its fair share of housing needs to determine whether an opportunity for additional low and moderate income units is necessary and, if so, to create such additional opportunity."

The John Street tract, which is the subject matter of this appeal, was designated in the judgment and settlement as land rezoned for inclusionary development which would generate low and moderate income housing units.[1] The obligations of the parties in the event that such rezoned land ceased to be available for development were established:

> In the event that any site rezoned under this agreement ceases to be available for development pursuant to the provisions adopted under section 3(a) of this agreement because of development for other purposes, condemnation, state or federal prohibitions or restrictions upon development or any other reason, the municipality upon written notice to and with the approval of plaintiffs, shall rezone sufficient other developable land pursuant to this provision to make it realistically likely that a sufficient number of units affordable to low and moderate income households will be constructed to satisfy the municipality's fair share.

Provision was also made for modification:

> The low and moderate income housing amendments as set forth in Exhibits "A" and "B" shall not be repealed, amended, or modified without the express consent of the plaintiffs, through their counsel, the Department of the Public Advocate, except as provided for elsewhere in this agreement. In the event of any breach of any provision of this agreement, the plaintiffs may seek relief by way of any remedy provided by law. The owners or assignees of the lands which are rezoned by this amendment are also recognized as third party beneficiaries with authority to enforce the terms of this settlement agreement.

Following upon the trial court's entry of its final judgment of compliance, based upon its finding that the settlement was "fair, adequate and reasonable", we affirmed. *Morris Cty. Fair Housing Council v. Boonton Tp.,* 209 *N.J.Super.* 108, 506 *A.*2d 1284 (App.Div.1986).

---

[1] At an early time, it was expected that development of the site would generate fifty units of low and moderate income housing. A site plan which gained planning board approval in November, 1988 provided for seventy units.

In October 1993, the County purchased the sixteen-acre John Street tract from the developer as the location for a new county jail. The purchase was contingent upon the issuance of all siting approvals and permits for the contemplated construction. In issuing the required freshwater wetlands permit, the Department of Environmental Protection (DEP) imposed a condition that "[p]rior to construction, the [County] shall submit proof from the Court Master that this is no longer an affordable housing site." Accordingly, the County filed the complaint in this matter, seeking judgment, *inter alia,* validating the siting procedures used as consistent with law; declaring that the County had complied with DEP's affordable housing condition; and declaring that the County's intended use of the John Street site for the jail superseded the 1984 settlement and judgment designating the site as a location for affordable housing. Ultimately, the relief sought was granted. The siting issues are not before us in this appeal, and we disregard them for the purposes of focusing on the only issues we are called upon to address, having to do with the trial court's determinations relative to the affordable housing issues and with the relief it ordered in that regard.

The Township, in its answering pleading, sought a judgment by way of counterclaim barring the construction of the county jail on the John Street site, based upon an allegation that the need for affordable housing outweighed the need for a jail. In the alternative, the Township sought a judgment requiring that the County "relieve the Township ... fully and completely and indemnify the Township ... from any further obligations either with respect to zoning other parcels in the Township ... for low and moderate housing or otherwise indemnifying the Township ... from the consequences of the relief sought by the County and requiring the County ... to actually construct on premises owned by the County ... the number of displaced low and moderate units." Further in the alternative, the Township sought an order relieving it of the fair share unit obligation attributable to the site.

In a cross-claim against the Morris County Fair Housing Council (FHC) and the Morris County N.A.A.C.P. (NAACP), both plaintiffs in the original suit and named defendants in this action,[2] the Township sought a judgment declaring that it had met its obligations under the 1984 judgment of compliance, relieving it from any further liability thereunder, and transferring all issues bearing upon its fair share obligations to the Council on Affordable Housing (COAH). In their joint answer and cross-claim, the FHC and the NAACP sought a determination that the affordable housing needs established in the 1984 judgment superseded the County's need for a jail at the specific site, or, if such a determination was not forthcoming, an order directing the Township to designate alternative affordable housing sites.

The League, an unincorporated association of residents of the neighborhood immediately adjacent to the John Street site, by way of cross-claim against the Township, sought an affirmation of the Township's fair share obligation as established in the 1984 judgment, along with a dismissal of the Township's alternative claim for relief that it be relieved of its fair share obligation.

The trial court disposed of the issues bearing upon the Township's affordable housing/fair share obligations in its October 31, 1994 order. In an oral opinion on October 14, 1994, Judge Stanton held that the Township had substantially complied with its obligations established in the 1984 judgment of compliance and was free to address its future affordable housing obligations through COAH. His order provided in pertinent part:

1. The Court finds that the Township of Morris has in good faith endeavored to comply with the August 20, 1984 Final Judgment of Compliance.... While the judgment has not been fully implemented it has served its fundamental purpose.

2. The Court does specifically further find that circumstances have substantially changed since 1984 with the passage of time, changes in legal modalities and the realization of important rights.

---

[2] Other named defendants did not appear: Riverview Condominiums, the former owner of the John Street tract, which had sold it to the County; and the Department of the Public Advocate, which had been abolished in the interim, *N.J.S.A.* 52:27E–51(a).

3. The August 20, 1984 Judgment of Compliance ... [is] no longer [a] useful mechanism[ ] for determining what should be done in Morris Township with respect to affordable housing and accordingly [is] determined to be of no further force and effect. The important issues of affordable housing shall hereafter be addressed pursuant to the Fair Housing Act and the Council On Affordable Housing. Within 90 days ... Morris Township shall submit to the Council on Affordable Housing its fair share housing plan under *N.J.S.A.* 52:27D–311 and shall seek substantive certification under *N.J.S.A.* 52:27D–313.

Only the League and the Township have appealed. The League, in its appeal, argues:

I. THE TRIAL COURT'S VACATION OF THE FINAL JUDGMENT WAS IMPROPER BECAUSE THE REQUIREMENTS OF RULE 4:50–1 WERE NOT MET.

II. THE COURT'S VACATION OF THE SETTLEMENT AGREEMENT ALSO VIOLATED WELL ESTABLISHED PRINCIPLES OF INTERPRETA-TION AND ENFORCEMENT OF SETTLEMENT AGREEMENTS.

III. THE COURT FAILED TO HOLD AN EVIDENTIARY HEARING AND IMPROPERLY TOOK JUDICIAL NOTICE OF CIRCUMSTANCES IN MOR-RIS TOWNSHIP THAT IT CONCLUDED JUSTIFIED VACATING THE SET-TLEMENT AGREEMENT AND FINAL JUDGMENT.

IV. TRANSFER TO COAH WAS IMPROPER.

V. THE SIX YEAR PERIOD OF REPOSE DOES NOT AUTOMATICALLY RELIEVE MORRIS TOWNSHIP OF ITS OBLIGATIONS UNDER THE SET-TLEMENT AGREEMENT AND FINAL JUDGMENT AFTER SIX YEARS.

In addition to advancing countervailing arguments as a respondent in the League's appeal, the Township raises the following condi-tional argument in its own appeal:

IF THE TRIAL COURT ERRED IN DIRECTING MORRIS TOWNSHIP TO APPLY TO COAH FOR SUBSTANTIVE CERTIFICATION, THEN THE COURT SHOULD CONSIDER THE COMPETING PUBLIC INTERESTS IN ADDRESSING THE DISPOSITION OF THE AFFORDABLE HOUSING UNITS SLATED FOR THE JOHN STREET SITE.

The County offers arguments opposing those framed by the League and argues, in respect of the Township's appeal, that the relief sought by the Township is "premature and procedurally untimely."

In his oral opinion, Judge Stanton noted that he was unable to find that the Township had substantially discharged its obligations as established by the terms of the 1984 judgment of compliance, primarily because the John Street site had not been developed as a location for the contemplated affordable housing units, and the

Township had not discharged its obligation under the judgment to provide other, appropriately zoned locations for substitute development if any site contemplated in the judgment ceased to be available. He observed, additionally, that it was unlikely that the John Street site would have been developed as a location for affordable housing units even if it had not been selected as the site for a jail, because the developer was in financial straits. He did find, however, that in the intervening ten years, the Township had "endeavored in a good-faith way and in a broadly effective way to comply with the terms of the judgment." This finding is supported by the record and judicially noticeable fact, *see N.J.R.E.* 201, bearing upon the Township's conduct during the ten-year life of the judgment of compliance from its entry to the date of the trial court decision herein. *See Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). Judge Stanton reached the conclusion

that the 1984 judgment entered by Judge Skillman with respect to Morris Township's fair housing obligations, has achieved its broad purposes and it has now outlived its usefulness as the appropriate mechanism for determining what Morris Township should do in terms of affordable housing.

He explained that the determination

of what the fair share of a municipality is with respect to regional needs for housing of all kinds and in particular for housing that will be affordable to low and moderate income households, that judgment at any point in time, factors into it just an enormous number of very complicated elements.

It is a very difficult figure to come by at any point in time, and everybody who has grappled with that question knows that it is a very difficult number to come by.

[The] 1984 ... judgment of compliance ... in effect gave its blessing to a settlement agreement, which was arrived at between the Township of Morris, various public interest groups, and the Public Advocate[.] [T]he parties, with some oversight from Judge Skillman, arrived at a judgment about what Morris Township's fair share would be.

And the view we should take of that now is that it was a good judgment for 1984, and for some considerable period of time thereafter. Not a perfect judgment. There's no such thing, of course, as a perfect judgment in this ... very complicated field. But it was a good judgment made in a cooperative, constructive way by intelligent and well-informed participants.

But that judgment has to be put into a context. And the context is, first of all, a social context of very complicated and ever-changing needs for housing, which depends tremendously on population, on migration of population, on employment

opportunities. It depends on an enormous number of economic factors that interplay, not just in Morris Township, but throughout all of Northern New Jersey, indeed throughout all the country, really, and the judgment is a very complicated one.

It is a judgment which is necessarily subject to change, because the dynamics are such that the social and economic realities are ever-changing, and after a period of time, they reach the stage where they are apt, just by the passage of time, to have changed so significantly that a judgment good at one point in time is not ... apt to be particularly useful at a significantly later point in time.

[T]he New Jersey Supreme Court, when it was struggling with *Mount Laurel I* and *Mount Laurel II,* when it was attempting to protect the constitutional right of the people of this state to affordable housing, was very conscious of the limitations of judicial expertise and judicial ability to supervise the actual provision of affordable housing for the people of this state.

What the judiciary can do effectively is to set certain ground rules that other players must observe in an effort to get affordable housing. But the judiciary simply lacks the capacity and the mission to actually supply affordable housing.

And, indeed, the judgments about what things like fair share are, are so complicated and are so much subject to dispute that perhaps the judiciary is not the ideal place in which those numbers should be determined at any point in time, much less steps taken to implement the achievement of those numbers.

So the Supreme Court[,] ... although it was obviously extremely serious about protecting the right of the public to affordable housing, was also very much of a mind at all stages that the real responsibility for getting affordable housing to be a reality should rest with the Legislature and then with the whole series of executive and private sector forces.

And the Court ... made it very much a point to urge the Legislature to act in this field, and to develop a good mechanism for trying to put affordable housing in place.

While the Court was doing that, and before the Legislature acted, the Court itself developed the concept of six years as being a time frame which would be useful for fixing obligations. And I think implicit in that fixing of a six-year period as a period during which certain obligations might be fixed and protected, the Court was recognizing that in this extremely dynamic and fluid field, judgments were apt to lose their validity after six years. Not in the legalistic sense, but in the real life, good judgmental sense.

And so the Court adopted as a matter of case law, a concept of six years as the period of repose for certain remedies, and it indicated a certain view with respect to this whole question of when judgments cease to be useful. The Court, of course, the Supreme Court did not address the kind of problem we have here. I don't mean to pretend that it did. It certainly did not. But it indicated a view about the fluidity of the situation.

I note, too, that if we look at the Municipal Land Use law in general, and not with reference to fair housing questions, affordable housing questions, we see that the Legislature in the broad area of planning and zoning has fixed the period of six

years as the period of what we might call maximum utility for any fixed set of planning and zoning regulations. Because the Legislature and the Municipal Land Use law required that municipalities every six years comprehensively reexamine their master plan and their zoning ordinances to make sure that they continue to make sense.

The Legislature did not say that there had to be massive changes or even any changes every six years in master plans and zoning ordinances, but it said they had to be comprehensively reviewed, because it recognized that with that much time in an area as dynamic as housing and zoning broadly, six years is a long time, and rules should be reexamined at least every six years.

I note too, that when the Legislature did finally in 1985 address the question of affordable housing by adopting the Fair Housing Act, it adopted a six-year period as being the period of repose once a municipality had obtained a certification of substantial compliance from the Council on Affordable Housing.

So I think if we look at a number of important sources we see that the concept is rather firmly fixed in this area of law, that things change, and that rules and policies and numbers should really be reevaluated at least once every six years.

Now it's also to be noted that when Judge Skillman entered his judgment in the Morris Township case in 1984, the Legislature had not yet adopted the Fair Housing Act. The Fair Housing Act became effective in 1985, and then there was a period of time before the Council on Affordable Housing really got organized and a further period of time before it got a good set of regulations in place, and then a period of time beyond that, before it developed expertise and experience and a kind of case law of its own, and formula of its own with respect to deciding questions of municipal fair shares with respect to affordable housing.

It is quite true that in 1986, Judge Skillman was specifically asked to transfer the ongoing enforcement of the judgment in his case to the Council on Affordable Housing. He was asked to transfer the case in the context which then existed. That meant really to transfer questions of enforcement of the judgment to the Council on Affordable Housing, and he declined to do so.

I think it was absolutely correct for him to have done that, because, in fact, in 1986 we were dealing with people who had struggled for years to get a judgment in place, and a judgment had been in place since 1984. It conferred substantial rights. Those rights were freshly conferred[,] . . . and just in terms of fundamental fairness to the parties, they should have been entitled for a reasonable period of time to get the direct benefits of that judgment.

But we are not now in 1986. We are in [1994]. We are eight years past 1986, and we are in a very different social and economic dynamic than Judge Skillman was in when he made his ruling in 1986.

And we have a Council on Affordable Housing, which is in a very different posture today than it was then, and we have regulations, which are much more comprehensively developed now than they were then.

I also note that what the affordable housing problem is about is, it involves the ongoing effort of responsible authorities in our society to make reasonable judgment about what the requirements of our society are for affordable housing at

various points in time, and then to take reasonable and effective steps to try to promote the actual construction of affordable housing.

When this judgment in 1984 was entered, the whole mechanism which has been established by the Fair Housing Act was not even adopted, much less in place and working. It is now.

It seems to me when we look at the change in legal modalities, when we look at the nature of the problems which we are attempting to deal with in this area of concern, when we look at the passage of time and when we see that important rights which were conferred by the 1984 judgment have, in fact, been realized with respect to many hundreds of actually constructed units, I think it's appropriate to say that the problem has not gone away. There still is an ever ongoing need for society to be aware of its responsibilities, constitutional and otherwise, to provide affordable housing for the population, but the way in which society responds to those concerns should change.

My judgment is that we are at the point where the question of affordable housing in Morris Township is more usefully and more fairly dealt with by applications made, in the first instance at least, to the Council on Affordable Housing. There does continue to be [a] broad judicial oversight role. The decision of the Council on Affordable Housing can be reviewed one way or another at different points, some place in the judiciary, but there's been a commitment by the Legislature, by the executive and, indeed, by our Supreme Court to the idea that the primary governmental responsibility, at least initially, in this area should now be with the Council on Affordable Housing.

There was a transition period when cases, such as the Morris Township case, were kept out of the Council on Affordable Housing, in order to take advantage of the judgments which had been made after long litigation, and in order to protect rights that had vested under those judgments.

But the passage of time, since 1984, 1986, has drastically altered the equitable considerations that go into enforcement of this judgment.

I think ... we've reached the stage where affordable housing questions in Morris Township should be decided in the mainstream way, which is under the auspices of the Council on Affordable Housing.

So I don't make a finding that the judgment's been satisfied, but I do make a finding that it's fundamentally achieved its broad purposes, that it's outlived its usefulness, and that the appropriate way for dealing with current and future questions of affordable housing is under the auspices of the Fair Housing Act and the Council on Affordable Housing.

I will enter a judgment to that effect, and so the judgment of 1984 is no longer going to be literally enforced, and we will look to general fair housing modalities and mechanisms for determination and for remedies in the area of affordable housing.

\*      \*      \*

Now I note that what we're dealing with is not the Legislature or the executive taking jurisdiction away from the judiciary or the Legislature or the executive divesting rights, which have vested under a judgment.

We're not talking here in the first place, I note, of normal economic or property or personal rights that have vested under a judgment. We're speaking of a judgment that dealt with very broad social and economic and constitutional issues, and those issues, if they're to be dealt with fairly, have to be, in my judgment, dealt with in a kind of rolling way ... by [a] judgment that is updated from time to time. By decisions which are updated from time to time to take account of what is going on ... in the real world around us.

And my view is that, although the judgment has not been literally fulfilled in all of its aspects, that it simply is no longer a useful mechanism for determining what should now be done in Morris Township with respect to affordable housing.

And that determination is being made, not by the same judge who entered that 1984 judgment, but by the Court which made that judgment. So it's not a question of the Legislature taking the judgment out of the court or divesting rights. It's a question of the Court itself deciding that its judgment is no longer a useful way of regulating the rights which are affected in this area of concern.

After the entry of the October 31, 1994 order, we denied leave to appeal. The Township then filed a petition with COAH for substantive certification. COAH determined that the Township's 1987–1999 precredited need was 324 units, 293 new construction and 31 rehabilitation. However, the Township's activities undertaken pursuant to the settlement entitled it to a 355–unit credit against the precredited need, resulting in a surplus of thirty-one units. COAH granted the Township's petition for substantive certification on May 1, 1996, allowing a period of repose of six years from that date. COAH viewed the League's objections as outside of COAH's jurisdiction because they addressed the Township's obligations under the consent judgment.

We are in substantial agreement with the reasons for decision expressed by Judge Stanton in his oral opinion and we affirm the terms of the October 31, 1994 order based upon those views. In reaching that conclusion, we decline to embrace any of the approaches suggested by the parties with respect to the basic questions whether the trial court was authorized to modify the 1984 judgment of compliance and, if so, whether it was well warranted in doing so. The premise of all three parties' arguments is that the trial court modified the 1984 judgment of

compliance. On the one hand, the League argues that the standards governing relief from a judgment or order, so well developed in the jurisprudence emanating from *R.* 4:50–1, have not been met. The County and the Township, on the other hand, contend that those standards have been met, although the County also argues that *R.* 4:50–1 does not apply to the situation at hand. We must address those questions, as well as the propriety of the trial court's cession of jurisdiction to COAH.

In order to identify the normative standards that govern the first question, we must first understand the basic features of the judgment which the trial court is said to have "modified." Neither the 1984 judgment of compliance nor the settlement upon which it was based unalterably addressed the use of the John Street site. Rather, they established the Township's obligation to provide zoning implementation and other governmental support for the attainment of a numerical fair housing goal. Clearly, the John Street site was contemplated as a major component of the plan that would achieve that goal, but the parties to the exclusionary zoning suit were realistic to contemplate that, during the six-year period of repose if not also thereafter, circumstances might occur that would render a particular site unavailable for inclusionary development. Thus, provision was made in the settlement that such an eventuality would not alter the Township's fair share obligation under the settlement and judgment. With a sensible regard for the possibility that changes of circumstances might even call for a modification of the basic provisions of the settlement and judgment, the parties made express provision for that eventuality, as well.

The trial court's determination that it could not find that the Township had substantially discharged its obligations under the 1984 judgment of compliance, and that, by the provisions of the judgment, the Township had a continuing obligation to identify a substitute tract or tracts for the affordable housing that had been lost through circumstance, was tantamount to a declination to modify the substantive provisions of the judgment, rather than

a decision to modify them. The trial court's action in that regard neither altered nor eliminated the Township's obligations under the judgment in the *R.* 4:50–1 sense.

The trial court's decision to cede jurisdiction over the Township's affordable housing obligations to COAH was another thing entirely, for it not only removed the court as the monitor of compliance, it resulted in an effective nullification of some of the Township's affordable housing responsibilities under the judgment because of a *post hoc* diminution of the Township's fair share obligation. We hold that the trial court's determination in this regard was well within its authority and discretion.

One development giving rise to that decision was the enactment of the Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329 (the Act), in 1985—a year after the judgment of compliance was entered—along with the evolution of COAH's plenary role in the subject matter field as a result. Also in the interim, the Supreme Court had not only declared that "vindication of the *Mount Laurel* constitutional obligation is best left to the Legislature." *Hills Development Co. v. Bernards Tp.,* 103 *N.J.* 1, 46–47, 510 *A.2d* 621 (1986); *see also Mount Laurel II, supra,* 92 *N.J.* at 212–14, 456 *A.2d* 390, but it had also expressly identified two major purposes of the Act as: "first, to bring an administrative agency into the field of lower income housing to satisfy the *Mount Laurel* obligation; second, to get the courts out of that field." *Hills, supra,* 103 *N.J.* at 49, 510 *A.2d* 621. Adoption of the Act offered the State and its constituent municipalities the "benefit of a coherent, consistent plan to provide a realistic opportunity for lower income housing." *Id.* at 51, 510 *A.2d* 621. Courts that continued to have jurisdiction over exclusionary zoning suits were instructed to "conform wherever possible to the decisions, criteria, and guidelines of the Council." *Id.* at 63, 510 *A.2d* 621.

In sum, it was COAH, acting pursuant to the standards established by the Legislature, that had come to be the State's repository of affordable housing policy; subject always, of course, to constitutional mandate. The role of the courts was secondary, and

supervisory primarily in the constitutional sense. Questions of how constitutional obligations relative to affordable housing were to be measured and allocated had come to be, in the first instance at least, the province of the coordinate branches of government.

Another development had also occurred which, while not engendering the decision to cede jurisdiction over the matter to COAH, bore importantly upon its aftermath. Between 1984, when the judgment of compliance was entered, and 1994, when the order under appeal was entered, there had been a theretofore unforeseen reduction in the State's affordable housing needs.

COAH's responsibilities include estimating the present and prospective need for low and moderate income housing at the State and regional levels and thereafter adopting the criteria and guidelines for determining each municipality's fair share of that need. *N.J.S.A.* 52:27D–307(b) & (c). Current need is based on the number of lower income families occupying substandard housing. *N.J.A.C.* 5:92, App. A. at 92–46 to –49; 25 *N.J.R.* 1119 (Mar. 15, 1993). Prospective need "is the share of the total projected population that will qualify for low- and moderate-income housing." *N.J.A.C.* 5:92 App. A. at 92–49. On May 1, 1986, COAH estimated a total statewide present and prospective need of 145,707 units. *Id.* at 92–46. Thus, each municipality's housing obligation for the 1987–1993 cycle consisted of its fair share of the estimated present and prospective need of 145,707 units. *Id.* at 92–49; *N.J.A.C.* 5:92–5.1.

For a variety of reasons, since 1986 substantial changes have occurred. The total statewide affordable housing need for the years 1987–1999 has dropped from over 145,000 to 86,308 units. *N.J.A.C.* 5:93, App. A. at 93–47. COAH has offered several explanations for this. 25 *N.J.R.* 1119 (Mar. 15, 1993). COAH relies exclusively on the census to collect information on substandard housing, a major component in determining present need. *Ibid.* Between 1980 and 1990 the United States Census Bureau collected different information on housing. "Perhaps due to the changes wrought by the U.S. Census Bureau; and/or rehabilita-

tion activity during the 1980s; and/or demolition activity during the 1980s, the resulting estimates of substandard units occupied by low and moderate income households are lower than those adopted by the Council for the 1987–1993 period." *Ibid.* Prospective need is lower than originally estimated because New Jersey has experienced lower growth than originally anticipated. *Id.* at 1119–1120.

> In 1986, when the Council projected need, even the most conservative projections available forecast tremendous growth in New Jersey. It did not happen.
>
> As the Council deliberated on the relationship between the previous and future estimates of need, it did not make sense for municipalities to be responsible for projected growth that did not occur. So, with the advantage of being almost through the 1987–1993 projection period, the Council has adjusted the 1987–1993 prospective need based on the best estimates of growth that actually occurred. Therefore, under the approach considered by the Council, 1987–1993 prospective housing need will be reduced.
>
> [*Ibid.*]

COAH applied current projections in calculating prospective need for the 1987–1999 cycle. *Id.* at 1120.

The adoption of the Act and the development of COAH's scope of operations thereunder are a fulfillment of the Supreme Court's expressed hope, *see Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp.,* 67 *N.J.* 151, 336 *A.*2d 713 (1975) (*Mount Laurel I* ), that once it identified the constitutional obligation of each municipality, through its land use regulations, to "provide a realistic opportunity for low and moderate income housing," *Mount Laurel II, supra,* 92 *N.J.* at 198, 456 *A.*2d 390, fulfillment of that obligation would be assumed by the Legislature. *Id.* at 212–14, 456 *A.*2d 390; *Oakwood at Madison, Inc. v. Township of Madison,* 72 *N.J.* 481, 534, 371 *A.*2d 1192 (1977); *see Hills, supra,* 103 *N.J.* at 46–47, 510 *A.*2d 621; *see also N.J.S.A.* 52:27D–303 (second sentence), –316. A trial court's determination to cede jurisdiction to COAH, the Legislature's designated agent for implementation of the State's fair housing policies, not only effectuates the Court's objectives, it also recognizes that courts are poor vehicles by which to achieve day-to-day implementation of public policies. *Oakwood at Madison, supra,* 72 *N.J.* at 534 n. 41,

371 *A.*2d 1192 (quoting Charles M. Haar, *Regionalism and Realism in Land Use Planning,* 105 *U.Pa.L.Rev.* 515, 530–31 (1957)); *Oakwood at Madison, supra,* 72 *N.J.* at 631–36, 371 *A.*2d 1192 (Clifford, J., concurring); *cf. Woodland Private Study Group v. State,* 109 *N.J.* 62, 77–79, 533 *A.*2d 387 (1987) (O'Hern, J., dissenting); *Yardville Supply Co. v. Board of Review,* 114 *N.J.* 371, 381, 554 *A.*2d 1337 (1989) (O'Hern, J., dissenting); *Doe v. Hillsboro Independent School Dist.,* 113 *F.*3d 1412, 1417 (5th Cir.1997) (Jones, C.J. and Smith, C.J., concurring); *People Who Care v. Rockford Bd. of Educ.,* 111 *F.*3d 528, 533 (7th Cir.1997); *Coalition to Save Our Children v. Delaware State Bd. of Education,* 90 *F.*3d 752, 779 (3d Cir.1996). Such a determination is especially apt when, as here, a great deal of time has passed since the entry of the judgment of compliance, and substantial demographic changes have occurred in the interim which the administrative agency is charged to monitor and best equipped to apply. When Judge Stanton ceded plenary jurisdiction over the Township's affordable housing obligations to COAH, he was acting in recognition of these realities, giving effect to the expressed intendment of the Supreme Court, and observing the mandates of salutary policies that underlie the judicial function.

■ No further evidentiary development was required before the trial court could validly make the order it entered, as the League contends. The League had every opportunity to assert the existence of factual disputes which bore upon the contentions it was advancing, which negated the positions of its adversaries, or which related to matters clearly before the trial court that were potentially subject to judicial notice, *N.J.R.E.* 201. It did not do so. It is axiomatic that a hearing must be held when questions of fact need to be resolved, *see, e.g., Barrie v. Barrie,* 154 *N.J.Super.* 301, 303, 381 *A.*2d 374 (App.Div.1977), *certif. denied,* 75 *N.J.* 601, 384 *A.*2d 831 (1978), but where a party fails to assert the existence of contested, material issues of fact, it will not thereafter be heard to attack an order of judgment entered in the absence of such a hearing on the ground that one should have been held.

The trial court's order in A–4420 is affirmed. The Township's conditional appeal in A–5203 is dismissed as moot.