774 A.2d 704 (2001)
340 N.J. Super. 511
MOUNT OLIVE COMPLEX, a New Jersey Partnership, Plaintiff-Appellant and Cross-Respondent, and
Mount Olive Villages Sewer Company, Inc., a New Jersey Corporation; and Mount Olive Villages Water Company, Inc., a New Jersey Corporation, Plaintiffs,
v.
TOWNSHIP OF MOUNT OLIVE, a Municipal Corporation; and Mayor and Township Council of the Township of Mount Olive, Defendants-Respondents and Cross-Appellants, and
Mount Olive Planning Board, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 2001.
Decided June 4, 2001.
*707 Bruce H. Snyder, Roseland, argued the cause for appellant/cross-respondent (Lasser Hochman, attorneys; Mr. Snyder, on the brief).
John H. Dorsey, Boonton, argued the cause for respondents/cross-appellants (Dorsey and Fisher, attorneys; Mr. Dorsey and Kathryn Roettger, on the brief).
Before Judges HAVEY, CUFF and LISA. *705
*706 The opinion of the court was delivered by HAVEY, P.J.A.D.
*708 This zoning dispute implicates Mount Laurel[1] issues and the extent to which a municipality may rely on the State Development and Redevelopment Plan (State Plan) in rezoning property located in the State Plan's "planning area 5" from single-family dwellings on small lots to one residential unit per five acres.
In the 1970s, plaintiff, a partnership consisting of experienced developers, assembled more than 1,000 acres of land in Mount Olive Township and secured approval for a Planned Unit Development (PUD) in an undeveloped portion of the Township. By the late 1970s, plaintiff had built Section I of the PUD, consisting of 833 units, mostly apartments. Mount Laurel litigation ensued against the Township. Although plaintiff was not a party to that action, pursuant to a court-ordered settlement it agreed to construct a 400-unit apartment complex with a forty-unit set aside for affordable housing within Section II of the PUD. The Mount Laurel litigation ended in a consent judgment of compliance entered on August 2, 1985.
In 1988, the Township declared that plaintiff's PUD approval had expired and, in 1996, it placed the remainder of plaintiff's property in its R-A zone, permitting cluster development, with one residential unit per two acres. By separate complaints, plaintiff sought a builder's remedy, and challenged the rezoning of its property. During the pendency of the consolidated matters, the Township increased the minimum lot size applicable to plaintiff's property from two to five acres. After a bench trial, the trial court rejected plaintiff's claim for a builder's remedy, but struck the Township's five-acre zoning as overly restrictive, and ordered the municipality to rezone within one year.
We affirm the judgment denying plaintiff a builder's remedy. However, we reverse the judgment invalidating the Township's zoning ordinance. In our view, a municipality's voluntary compliance with the State Plan should be a significant factor in a reviewing court's determination respecting the validity of a zoning or rezoning ordinance. We conclude that the ordinance adopted by the Township advances the goals of the State Plan, and indeed, was tailored for that purpose. Further, the ordinance advances several of the purposes of zoning set forth in the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136.
In 1971, plaintiff owned 941 acres in the Township bounded on the north by Route 46, Bartley-Drakestown Road and Washington Township on the west, Flanders-Drakestown Road on the south and Wolfe Road on the east. The site was characterized by wetlands, steep slopes, farmlands and woodlands, and traversed the south branch of the Raritan River, a trout-production stream. Plaintiff obtained preliminary approval for a PUD on the site, calling for commercial and industrial development and 3,063 mixed residential units.
In October 1972, plaintiff obtained final approval for Section I of the PUD, consisting of 203 acres and providing for forty-five single-family dwelling units, 152 townhouses, 636 apartment units, 42.63 acres reserved for a school site and open space, and a portion of the tract for commercial or industrial development. In addition, plaintiff agreed to acquire a 206-acre *709 tract from the YMCA to serve as a drainage basin for Section I. All of the units in Section I were constructed by the late 1970s. The portion of Section I designated for commercial/industrial use was never developed.
By 1979, the Township had repealed the PUD ordinance and rezoned plaintiff's property R-3, permitting three single-family residential units per acre. Plaintiff had constructed a 250,000 gallon per day (gpd) sewer plant to serve Section I. That plant discharges treated sewage into three spray irrigation fields, including a field located in proposed Section II, south of Section I.
In 1980, plaintiff was prepared to move forward with the development of its remaining tract but could not proceed without an expanded sewer plant. The Township sought a plant large enough to service approximately 2,200 homes in the Budd Lake area which then had septic systems causing pollution of the lake. In September 1983, plaintiff and the Township agreed on a plan for a treatment plant having a capacity of 1.55 million gpd; plaintiff agreed to secure the necessary approvals from the Department of Environmental Protection (DEP). In December 1984, plaintiff applied to the DEP for a Discharge Allocation Permit (DAC) for a discharge of 1.55 million gpd into the south branch of the Raritan River.
During this period, the Township was in the process of updating its 1975 master plan. However, work on the plan was delayed because of a pending exclusionary zoning law suit filed by the Public Advocate and others in the 1970s. On May 14, 1985, the Township, Public Advocate, the Morris County Fair Housing Council, the Morris branch of the N.A.A.C.P., and a builder (not plaintiff) reached a settlement, which was approved by the trial court on August 2, 1985. The parties fixed the Township's fair share through 1990 at 500 units, 250 low-income and 250 moderate-income. However, in order to ensure "full and adequate compliance" with Mount Laurel II, the Township agreed to provide an additional forty moderate-income units to be built within plaintiff's PUD. Although not a party to the litigation, plaintiff agreed to construct forty moderate income rentals within a 400 unit complex to be constructed as part of Section II of the development. In addition, the Township agreed that the 250 garden apartment units designated as Mount Laurel units under the judgment of compliance would be subject to voluntary rent controls. Accordingly, the Township negotiated an agreement with plaintiff under which ten percent of the 400 units to be constructed in Section II would be subject to income and affordability controls.
The Township's 1986 master plan continued to designate plaintiff's undeveloped property as R-3, three units per acre. The State Development Guide Plan, predecessor to the State Plan, had classified much of the Township as limited growth area, and plaintiff's property as either agricultural or limited growth. At that time, approximately two-thirds of the Township remained undeveloped, and a significant percentage of those undeveloped tracts were remote, wet, or characterized with steep terrain.
On June 25, 1986, the DEP issued a draft DAC to plaintiff for its proposed 1.55 million gpd sewer plant containing very strict conditions because of the purity of the south branch of the Raritan River. According to Omni Environmental Corporation (Omni), an expert retained by plaintiff for this litigation, the DEP determined that the discharge quality must be the same as that of the receiving water, and imposed effluent limitations which, in the opinion of Omni, "have never been achieved by domestic wastewater treatment *710 plants in New Jersey." On March 27, 1987, the DEP imposed even more stringent effluent limitations in its final DAC. In May 1987, the Township's attorney notified plaintiff that the Township had not committed to a 1.55 million gpd sewer plant and that plaintiff must proceed at its own risk in incurring costs for the design and for obtaining necessary approvals. Thereafter, the DAC approval expired.
In 1987, the Council on Affordable Housing (COAH) reduced the Township's fair share from 500 to 227 units. In 1988, Township officials expressed concerns about the density of development throughout the Township. As a consequence, the parties met in July 1988. During negotiations with the Township plaintiff proposed: (1) changing the zoning on the YMCA property from R-1 to R-3, permitting construction of 411 homes, rather than retaining the property for drainage purposes; (2) reinstating the PUD ordinance for the balance of the tract; and (3) eliminating the requirement that a portion of the PUD be developed for commercial and industrial uses.
At approximately the same time, plaintiff's engineer submitted a feasibility study reporting that a 1.55 million gpd system would cost approximately $22,000,000. The engineer stated that the high cost was attributable to the "very stringent requirements" imposed by the DEP concerning discharge into the south branch of the Raritan River. The Township's engineer testified that the Township could not have afforded that amount of money in 1988.
In October 1988, the Township terminated negotiations with plaintiff and, in November 1988, declared that plaintiff's PUD had expired. The Township also notified the DEP that because of the expiration of the DEP's DAC approval, there would be no need for the proposed sewer plant and that the Township had never committed itself to financing the facility. Plaintiff's partners met to discuss the Township's actions. Salvatore Garofalo, one of the principals, recommended that plaintiff institute suit against the Township. However, a majority decided not to pursue litigation.
In 1989, John Lynch, the Township's planning consultant, cautioned the Township that large parts of plaintiff's undeveloped land were environmentally sensitive and a preliminary draft of the State Plan had designated the property as outside the growth area. In a follow-up memorandum, Lynch suggested that the property be placed in the R-A zone, permitting one residential unit per two acres. Lynch reported: The map on the reverse side of this memorandum shows the suggested zoning changes in the vicinity of Wolfe Road, River Road and Drakestown Road. They are proposed in recognition of low density zoning in Washington Township, recent development patterns along River Road, and awareness of environmental sensitivities related to steep slopes, and the preservation of water quality in the South Branch of the Raritan River. The proposed changes decrease the potential for nonresidential development impacts on Drakestown Road and Flanders Drakestown Road, remove the opportunity for high density residential development in the environmentally sensitive areas lying south of River Road and west of Shop Lane, and provide a more suitable zoning response to the 1980 State Development Guide Plan and the emerging State Development and Redevelopment Plan.
On April 30, 1990, plaintiff sold approximately sixteen acres of its YMCA tract to the Township for $470,400, on which the *711 Township intended to construct a municipal complex.
In 1992 or 1993 the Planning Board began a comprehensive review of the Township's land use ordinances. These efforts resulted in a September 28, 1995 master plan reexamination report. The report noted several significant events since the 1986 master plan, including regulatory changes which placed wetlands and stream protection under the jurisdiction of the State agencies, case law invalidating a "central assumption" of the 1986 master plan, that is, that environmentally sensitive areas such as wetlands, flood hazard zones and steep slopes should be excluded from lot size and floor area calculations,[2] and, finally, promulgation of the State Plan in 1992,[3] which placed almost all of the Township in "planning area 5," the environmentally sensitive planning area, or "planning area 4B," a rural/environmentally sensitive planning area. The report stated that the "most important concept" in the State Plan, from the Township's perspective, was "to concentrate much of the new development in areas already served by sanitary sewer, potable water, and modern roads or areas scheduled for reasonable expansion of such infrastructure," areas which the State Plan designates as "centers." The plan indicated that the area around Budd Lake and certain other sections of the Township could qualify as centers, but not plaintiff's property. In 1995, the governing body implemented the reexamination report by zoning plaintiff's property R-A, permitting clustering on two-acre lots.
In October 1995, plaintiff filed suit seeking to validate its rights under the 1971 PUD approval. It also sought to invalidate the R-1 zone as contrary to sound zoning principles, irrational and confiscatory. The Planning Board continued review of the master plan. On July 18, 1996, the Planning Board adopted a housing element and fair share plan with the view toward obtaining substantive certification from COAH. By that time, COAH had further reduced the Township's fair share to 181 units.
In November 1996, Lynch prepared a draft land use plan which recommended changing minimum lot size in the Township's most environmentally sensitive areas from two acres to five acres, but allowing lot-size averaging and clustering rather than the former approach, which required site adjustments for environmentally constrained land. The goals of the revised plan included guiding residential development toward areas to be served by public water and sewer and encouraging low-density residential development in areas characterized by steep slopes, flood plains and wetlands. The draft zoning map showed substantial areas of the western and southwestern portion of the Township recommended for two-acre lots, five-acre lots or public conservation.
In March 1997, plaintiff filed a Mount Laurel action demanding a builder's remedy to vindicate its rights under the 1985 judgment of compliance. The matter was consolidated with plaintiff's action filed in October 1995. The Township petitioned COAH for substantive certification on April 11, 1997, but COAH would not accept jurisdiction while plaintiff's *712 Mount Laurel action (filed one month earlier) was pending in the trial court.
During the pendency of the consolidated actions, the Township amended its zoning ordinance changing the RA-1 designation to RR-AA, permitting one unit per five acres. The 1998 zoning map reveals that a substantial portion of plaintiff's tract falls within the RR-AA zone. The zone extends beyond plaintiff's property in a southerly direction approximately 8,000 feet to Chester Road. A substantial portion of the Township north of Route 46 is also zoned RR-AA. The RR-AA five-acre zone has a cluster option designed to allow the construction of twenty units on a 100-acre tract, with minimum lot size being determined by the developer, so long as it was larger than 60,000 square feet.
At the close of the bench trial, the trial court denied plaintiff's request for a builder's remedy, concluding that plaintiff was not a "major player" in the settlement of the Mount Laurel litigation resulting in the 1985 judgment of compliance. The court also rejected plaintiff's claim that there had been "massive noncompliance by the township" with the judgment of compliance justifying the grant of a builder's remedy to plaintiff. The judge viewed the Township's delay in seeking substantive certification from COAH not as defiance to the judgment of compliance, but merely "taking one's chances, in a certain sense, with the judgment."
However, the trial court invalidated the Township's RR-AA zone and the predecessor R-A zone. It determined that the Township's motivation was to slow down growth because the Township was "overdeveloped, that it was becoming unbalanced, in terms of its density." It acknowledged the relevance of the passage of the State Plan and that "upscale" subdivisions had recently been built reflecting the Township's policy favoring low-density, cluster developments in the subject area. However, the court found that five-acre zoning was "just enormous overkill" and the two-acre zoning, under the predecessor R-3 zone, a "substantial overkill." Concluding that a "plausible case" can be made for some larger lot zoning, the court gave the Township one year within which to enact an ordinance compliant with its findings.

I
Plaintiff argues that it is entitled to a builder's remedy in order to vindicate its right under the 1985 judgment of compliance because the Township has ignored its constitutionally-mandated obligation to provide affordable housing in adherence with the mandates of the 1985 judgment. Plaintiff's argument is predicated on the assumption that the judgment fixed the Township's fair share between 500 and 540 units in perpetuity, and that the current fair share, 181 units, does not apply.
The overriding issue in a Mount Laurel case is whether a municipality has created a realistic opportunity for the construction of its fair share of the region's needs for affordable housing. Southern Burlington Cty. N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 205, 456 A.2d 390 (1983) (Mount Laurel II). A developer is entitled to a builder's remedy if: (1) it succeeds in Mount Laurel litigation; (2) it proposes a project with a substantial amount of affordable housing; and (3) the site is suitable, that is, the municipality fails to meet its burden of proving that the site is environmentally constrained or construction of the project would represent bad planning. Id. at 279-80, 456 A.2d 390; Shire Inn, Inc. v. Borough of Avon-by-the-Sea, 321 N.J.Super. 462, 465, 729 A.2d 473 (App.Div.), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999). "The builder's remedy is a device that rewards a plaintiff seeking *713 to construct lower income housing for success in bringing about ordinance compliance through litigation." Allan-Deane Corp. v. Bedminster Township, 205 N.J.Super. 87, 138, 500 A.2d 49 (Law Div. 1985).
As noted, in rejecting plaintiff's builder's remedy claim, the trial court observed that plaintiff was not a "major player" in the Mount Laurel litigation and ultimate entry of the 1985 judgment of compliance. It is true that plaintiff was not a named party to the 1985 Mount Laurel litigation. Moreover, its property was not rezoned as an inclusionary site under the judgment. Nevertheless, plaintiff argues that its agreement to provide forty moderate-income units in its PUD, thereby increasing the Township's fair share from 500 to 540 units, was critical to the ultimate settlement of the Mount Laurel litigation. Essentially, it charges that, but for its willingness to provide the additional affordable units, there would have been no settlement.
There is no direct authority for the proposition that a landowner "may be entitled to a builder's remedy merely because of [its] active or even helpful participation in the revision process and compliance hearing." Id. at 138-39, 500 A.2d 49. Here, the evidence suggests that plaintiff's concessions may have been a significant factor in the Public Advocate's ultimate acquiescence to the terms of the settlement. However, it is simply too speculative to conclude that the 1985 judgment would have been entered into without plaintiff's participation in the negotiations. See Toll Bros., Inc. v. Township of West Windsor, 334 N.J.Super. 77, 104, 756 A.2d 1056 (App.Div.2000) (Toll Bros. II) (holding that without the intervenor's consent and participation in the negotiations "it is doubtful whether any settlement could have been achieved"). Thus, the fact that plaintiff may not have been a "major player" does not foreclose it from challenging the municipality's unilateral modification of the judgment of compliance.
Nevertheless, plaintiff failed to satisfy the first prong of the Mount Laurel II builder's remedy test: it did not prove that the Township's land-use regulations in place at the time plaintiff first brought its Mount Laurel action in 1997 failed to provide the requisite realistic opportunity for satisfaction of the Township's fair share. Mount Laurel II, supra, 92 N.J. at 205, 456 A.2d 390. On September 1, 1999, subsequent to the entry of the trial court's judgment in this case, COHA granted the Township substantive certification, finding that the Township had satisfied its fair-share obligation of 181 Mount Laurel units. COAH's approval of the fair-share plan is virtually conclusive; under the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329, fair-share plans certified by COAH carry a presumption of validity, which the challenger can rebut only by producing clear and convincing evidence that the housing element and fair-share plan do not provide a realistic opportunity for the provision of the municipality's fair share. N.J.S.A. 52:27D-317a.
Plaintiff has moved to suppress that portion of the Township's appendix containing COAH's September 1, 1999 substantive certification, arguing that we should not consider it because it was not part of the record before the trial court. See R. 2:5-4(a). We have denied that motion. Rule 2:5-4(a) is intended to give notice to litigants that a reviewing court will not consider evidentiary material which is not in the trial court's record. State v. Harvey, 151 N.J. 117, 201-02, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000); County of Bergen v. Borough of Paramus, 79 N.J. 302, 309-10 n. 2, 399 A.2d 616 *714 (1979). COAH's substantive certification was a quasi-judicial determination by a State agency, not "evidentiary material." A reviewing court may, in its discretion, take judicial notice of a determination by a governmental agency. N.J.R.E. 201(a); N.J.R.E. 202(b). Moreover, our consideration of COAH's substantive certification after the trial court's judgment is no different than our consideration under the "time of decision" rule of a post-judgment adoption of an amendment to a zoning ordinance which may affect a zoning issue before us. See Manalapan Realty v. Township Comm. of Township of Manalapan, 140 N.J. 366, 386, 658 A.2d 1230 (1995).
There is no merit to plaintiff's argument that the Township is bound in perpetuity by the fair-share allocation under the judgment of compliance. A fair-share determination is subject to change; indeed, the 1985 judgment in this case fixes the Township's fair share only through the year 1990. Moreover, the FHA charges COAH with fixing a municipality's fair share. N.J.S.A. 52:27D-307c(1). See Hills Dev. Co. v. Bernards Township, 103 N.J. 1, 22, 510 A.2d 621 (1986). Courts hearing and deciding exclusionary zoning cases should follow COAH's fair-share methodology. Id. at 63, 510 A.2d 621, and see Bi-County Dev. Corp. v. Mayor of Borough of Oakland, 224 N.J.Super. 455, 458-59, 540 A.2d 927 (Law Div.1988).

II
Plaintiff also argues that the Township had no right to unilaterally rezone its property which, according to the 1985 judgment of compliance, was to provide forty moderate-income units in Section II of the PUD.
After judgment was entered, we held in Toll Bros. II, supra, that a municipality seeking to alter a property owner's rights under a consent judgment of compliance must proceed pursuant to Rule 4:50-1(e), which authorizes relief where the "`judgment or order has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application.'" 334 N.J.Super. at 98, 756 A.2d 1056 (quoting R. 4:50-1(e)). Noting that Rule 4:50-1(e) is identical to Fed.R.Civ.P. 60(b)(5), we relied on federal case law establishing standards for modifying consent judgments entered in public interest litigation, such as prisoners' rights litigation, desegregation cases, or employment discrimination actions. Id. at 99, 756 A.2d 1056.
Toll Bros. II holds that to modify or terminate a Mount Laurel consent decree, the movant "`must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance.'" Id. at 100, 756 A.2d 1056 (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 393, 112 S.Ct. 748, 765, 116 L.Ed.2d 867, 892 (1992)). Relying on Rufo, we explained:
The factual changes which may warrant modification include conditions which make compliance with the decree substantially more onerous, when a decree proves to be unworkable because of unforeseen obstacles, or where enforcement without modification would be detrimental to the public interest. Id., 502 U.S. at 384, 112 S.Ct. at at 760, 116 L.Ed.2d at 886-87. The factual changes need not be limited to those which were both unforeseen and unforeseeable. Id., 502 U.S. at 385, 112 S.Ct. at 760, 116 L.Ed.2d at 887. "Ordinarily, however, modification should not be granted where a party relies upon events that *715 actually were anticipated at the time it entered into a decree."
[Toll Bros. II, supra, 334 N.J.Super. at 100, 756 A.2d 1056 (quoting Rufo, supra, 502 U.S. at 385, 112 S.Ct. at 760, 116 L.Ed.2d at 887).]
In remanding, we offered some guidance on the relevant issues. Id. at 102, 756 A.2d 1056. The trial court should consider: (1) whether the two sites in that case removed from the judgment of compliance remain suitable for affordable housing; (2) COAH's policy impact on the 1985 consent judgment, since COAH regulations amounted to a significant change of the law; (3) the length of time between entry of the 1985 judgment and the developers' attempts to enforce their rights thereunder; (4) the general decline of the housing market in the late 1980s and early 1990s; and (5) the municipality's position in the underlying exclusionary zoning litigation, where it argued the developers' sites remained appropriate for inclusionary zoning. Id. at 102-106, 756 A.2d 1056.
Plaintiff argues that at least a remand to the trial court is in order so that it may apply the Toll Bros. II standards to the present facts. We decline to remand since our independent review of the record in exercising original jurisdiction, Rule 2:10-2, satisfies us that the Township's revisions of its zoning ordinance subsequent to the 1985 judgment of compliance meets the Toll Bros. II standards justifying modification of the judgment.
First, since the 1985 judgment, there have been two revisions of the Township's fair share, reducing the number from 500 to 540 units to 181. Further, as noted, on September 1, 1999, COAH approved the Township's fair-share plan and certified that it had fulfilled its Mount Laurel obligation. In the circumstances, the consent judgment has achieved its fundamental purpose, and thus, there is no reason to literally enforce its provisions. See County of Morris v. Riverview Condominiums, Inc., 304 N.J.Super. 322, 332-33, 700 A.2d 884 (App.Div.1997), certif. denied, 152 N.J. 364, 704 A.2d 1299 (1998).
Moreover, there have been significant changes in the law. In 1985, there were no comprehensive state wetlands regulations; the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, was not enacted until July 1, 1987, and did not take effect until July 1, 1988. See MCG Assocs. v. Department of Envtl. Prot., 278 N.J.Super. 108, 111, 650 A.2d 797 (App.Div.1994). Prior thereto, wetlands were regulated by a variety of State and federal programs. Ibid. Similarly, the State Planning Act, N.J.S.A. 52:18A-196 to -207, did not take effect until 1987 and the State Plan was not finally approved until June 12, 1992. New Jersey Builders Ass'n v. New Jersey Department of Envtl. Prot., 306 N.J.Super. 93, 95 n. 1, 703 A.2d 323 (App.Div. 1997). Finally, as noted in Toll Bros. II, the adoption of the FHA in 1985, and its implementing regulations, represent a significant change in law. All of these changes in the legal landscape work against plaintiff.
Another significant change in law and fact concerns whether the questionable availability of sewer service to plaintiff's site makes it appropriate to enforce that portion of the judgment allowing it to build 400 apartment units in Section II. Toll Bros. II, supra, 334 N.J.Super. at 104-05, 756 A.2d 1056, viewed the availability of sewer service as a critical issue; the consent judgment there assumed that the two inclusionary sites could secure public sewer at a reasonable cost, but "if that assumption is proven to be incorrect, it may warrant relief from the consent judgment and consent orders." Here, it is undisputed that a 400-unit apartment complex would require public sewer, yet it is debatable *716 whether that could be accomplished. In this regard, potential changes in the law could have a dramatic impact on plaintiff's ability to secure sewer service for its tract. The DEP has proposed regulations which would link future infrastructure development to the State Plan and restrict funds for infrastructure to planning areas 1 or 2 or in designated centers. See 32 N.J.R. 2285, 2288-90 (July 3, 2000); Thomas J. Hall, A New Look at New Jersey's Land Acquisition Policy; Will the State Really be Able to Protect 1 Million Acres from Development?, 160 N.J.L.J. 1190 (June 19, 2000). Should those regulations be adopted and upheld, it is difficult to see how plaintiff could provide sewer service to a large apartment complex.
Another factor supporting our conclusion that no remand is necessary is plaintiff's delay in enforcing its rights under the consent judgment. Laches is a relevant consideration in a court's decision to modify or refuse to enforce a consent decree in public interest litigation. Cook v. City of Chicago, 192 F.3d 693, 695 (7th Cir.1999). The doctrine of laches bars a party from enforcing a right where there has been an unexplainable and inexcusable delay and prejudice to the other party. Morris County v. Fauver, 153 N.J. 80, 105, 707 A.2d 958 (1998).
Here, the Township notified plaintiff in October 1988 that the PUD approvals had expired. At that point plaintiff's partners debated whether to file suit to vindicate its rights under the consent judgment. It deliberately decided not to file suit to enforce its rights until 1997, after the Township had revised its master plan and devised a housing element and fair-share plan under the COAH regulations. At the time the Township informed plaintiff that its rights under the PUD had expired, courts had already established that parties to Mount Laurel consent decrees could vindicate their interests through motions to enforce litigant's rights. Morris County Fair Hous. Council v. Boonton Township, 228 N.J.Super. 635, 640, 550 A.2d 777 (Law Div.1988); Morris County Fair Hous. Council v. Boonton Township, 220 N.J.Super. 388, 394, 532 A.2d 280 (Law Div.1987), as modified, 230 N.J.Super. 345, 553 A.2d 814 (App.Div.1989). In debating whether to enforce those rights, and deciding not to do so until 1997, plaintiff's delay was inexcusable.
Moreover, the Township has demonstrated prejudice. During the nine-year delay, the Township made an exhaustive study of its overall zoning scheme and went about its business of redrafting its master plan, amending its zoning ordinance and preparing and filing a fair-share plan with COAH.
We conclude that the trial court properly denied plaintiff a builder's remedy.

III
On its cross-appeal, the Township argues that the trial court erred in setting aside its current zoning ordinance placing plaintiff's property in the RR-AA (one unit per five acres) district. The Township contends that plaintiff failed to demonstrate that the ordinance was arbitrary, unreasonable or capricious and that the trial court's "sparse findings" do not support its legal conclusions.
The trial court concluded the RR-AA zone was contrary to a fundamental requirement of zoning ordinances: that they be "drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses...." N.J.S.A. 40:55D-62a. It observed that five-acre zoning was an "enormous overkill," given the "highly intense development to the east and to the north of" the undeveloped portion of plaintiff's tract.
*717 The proofs established that property to the north and east of plaintiff's undeveloped tract had been developed for a variety of more intensive uses, including three apartment complexes, older single-family dwellings on small lots and commercial uses abutting Route 46.
Municipalities possess the power to zone, which is an exercise of the police power, only insofar as it is delegated to them by the Legislature. Riggs v. Long Beach Township, 109 N.J. 601, 610, 538 A.2d 808 (1988). "A presumption of validity attaches to a zoning ordinance that may be overcome only if an opponent of the ordinance establishes the ordinance is `clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute.' " Manalapan Realty, supra, 140 N.J. at 380, 658 A.2d 1230 (quoting Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 343, 307 A.2d 563 (1973)). An ordinance or an amendment thereto must advance one of the purposes of zoning under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136, specified in N.J.S.A. 40:55D-2. Manalapan Realty, supra, 140 N.J. at 380, 658 A.2d 1230; Riggs, supra, 109 N.J. at 611, 538 A.2d 808. Also, "[w]here ... an ordinance does not infringe upon a fundamental right, there is no requirement that it recite `tangible, specific objectives promoted by the ordinance in order [for the ordinance] to be valid.'" Manalapan Realty, supra, 140 N.J. at 380, 658 A.2d 1230 (quoting Zilinsky v. Zoning Bd. of Adjust. of Verona, 105 N.J. 363, 371, 521 A.2d 841 (1987)). Finally, the ordinance must be "substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements, N.J.S.A. 40:55D-62, unless the requirements of that statute are otherwise satisfied." Riggs, supra, 109 N.J. at 611, 538 A.2d 808.
The judicial role in the review of the validity of a zoning ordinance is circumscribed. In making its determination as to whether the opponent of the ordinance has met its demanding burden of overcoming the presumption of validity, courts must not question the wisdom of the ordinance; if the ordinance is debatable, it should be upheld. Bow & Arrow Manor, supra, 63 N.J. at 343, 307 A.2d 563. It has long been established that:
It is commonplace in municipal planning and zoning that there is frequently, and certainly here, a variety of possible zoning plans, districts, boundaries, and use restriction classifications, any of which would represent a defensible exercise of the municipal legislative judgment. It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable, it is to be sustained.
[Ibid.]
We recognize that generally our review of the trial court's findings of fact is limited. We give deference to the trial court's findings when supported by adequate, substantial and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). The rationale underlying this limited scope of review is that "a trial judge's findings are substantially influenced by his or her opportunity to hear and see the witnesses and to get a `feel' for the case that the reviewing court can not enjoy." Township of West Windsor v. Nierenberg, 150 N.J. 111, 132, 695 A.2d 1344 (1997).
*718 The trial court also has a "better perspective than a reviewing court in evaluating the veracity of the witnesses." Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988).
However, in this case, the trial court made no credibility findings. It accepted the experts presented on both sides as "serious substantial experts with very considerable expertise in the matter of land use planning," but made no findings respecting the worth of the experts' competing testimony and opinions concerning critical land-use issues, such as the nature and extent of environmental constraints affecting the subject property. Significantly, the court also did not consider whether the Township's rezoning of the property advanced one or more of the purposes of the zoning under the MLUL. Nor did it articulate a factual basis respecting how or if plaintiff had met its heavy burden of overcoming the presumption of validity afforded the challenged ordinance. Consistent with the teachings of the Court in Bow & Arrow Manor and Riggs, we review the legal correctness of the trial court's invalidation of the Township's ordinance in light of the fundamental legal principles implicated in a zoning case.
A zoning ordinance must be drawn with "reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land." N.J.S.A. 40:55D-62a. Richard Coppola, plaintiff's expert, testified that large-lot zoning was inconsistent with the pattern of land development in the area. He noted that to the east lie apartment complexes at a density of twelve dwelling units per acre, as well as older single-family homes on smaller lots. Moreover, he observed that commercial development existed to the north along Route 46, agricultural and vacant land to the south, and one-half acre to one-acre development in Washington Township to the south of plaintiff's tract.
However, it is undisputed that much of the land south, south-east and west of the tract is either vacant, zoned for larger lots, or developed with single-family homes on lots of one-acre or more. For example, the subject property adjoins a zone in Washington Township providing for two-acre lots. John Lynch, the Township's planning consultant since 1972, noted that development around the existing PUD has largely consisted of single-family homes on larger lots, ranging from one acre to 2.5 acres, adjoining areas of Washington Township are zoned for two-acre lots, the land to the south has remained undeveloped, and the RR-AA zone is separated by 1000 feet from Route 46. Moreover, the south branch of the Raritan River represents a natural characteristic separating the developed portion of the PUD and the remaining undeveloped tract. Lynch observed that rivers are commonly used as zoning boundaries. Lynch further noted that plaintiff's undeveloped property is more oriented toward Washington Township, which has two-acre zoning adjoining plaintiff's tract.
Charles McGroarty, the Township's director of planning, zoning and code enforcement, added that south of the developed portion of plaintiff's PUD, a number of developments have been built, approved, or planned for single-family homes with an average lot density of between two units per ten acres and five units per ten acres. For example, in March 1998, the Planning Board approved a development of five homes on a twenty-one-acre tract, and recently a developer has assembled a 562-acre parcel zoned RR-AA. McGroarty explained that plaintiff's tract is more environmentally constrained than these subdivisions.
*719 Further, the Township's R-A two-acre zone, and later the RR-AA zone, incorporated the "cluster" concept which, according to Lynch, was a sound land-use tool allowing site-specific adjustments based on environmental characteristics. Accordingly, the RR-AA zone permits clustering of lots at a .2 per acre density, taking into account ecological and environmental concerns. This low-density zoning concept is not without precedent. See Fischer v. Bedminster Township, 11 N.J. 194, 205, 93 A.2d 378 (1952) (upholding five-acre zoning in Bedminster, a rural, sparsely populated municipality characterized by hilly terrain, woodlands and farmlands); see also Albano v. Mayor of Washington Township, 194 N.J.Super. 265, 275, 476 A.2d 852 (App.Div.1984) (sustaining three-acre zoning in Washington Township in view of the fact that the property was crossed by five streams, and high-density development might threaten further pollution to a nearby lake).
The record is also clear that the Township considered the purpose of zoning under N.J.S.A. 40:55D-2j, the conservation of open space and natural resources and the prevention of degradation to the environment. A municipality may take into consideration ecological and environmental concerns. Sporkin v. Township of Stafford, 227 N.J.Super. 569, 571, 548 A.2d 218 (App.Div.1988); see Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 229 n. 3, 430 A.2d 881 (1981) (in developing valid zoning regulation municipality may consider public policy of the State as reflected in its legislation that "every person has a substantial interest in protecting the State's environment from pollution, impairment and destruction").
Of course, at least in the context of exclusionary zoning, while environmental factors are "always to be given consideration in zoning, ... `the danger and impact must be substantial and very real (the construction of every building or the improvement of every plot has some environmental impact)not simply a make-weight to support exclusionary housing measures or preclude growth....'" Oakwood at Madison, Inc. v. Township of Madison, 72 N.J. 481, 544-55, 371 A.2d 1192 (1977) (quoting Mount Laurel I, 67 N.J. at 187, 336 A.2d 713). Here, the credible evidence demonstrates without question that the environmental constraints are "substantial and very real."
There was compelling testimony presented by the Township's experts concerning the environmental constraints affecting the rezoned property. Much of plaintiff's rezoned property is unbuildable because of steep slopes, freshwater wetlands, flood plains, and the necessity of controlling aquifer recharge. McGroarty explained that in the late 1980s, pursuant to the newly-enacted Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, the DEP mapped the Township and concluded that the rezoned area had extensive wetlands. McGroarty testified that some of the wetlands on plaintiff's property are of "exceptional resource value," because they discharge into the south branch of the Raritan River, a trout production stream. See N.J.S.A. 13:9B-7a(1). These wetlands are the most highly-protected category, In re Freshwater Wetlands Prot. Act Rules, 238 N.J.Super. 516, 518, 570 A.2d 435 (App.Div.1989), and require a transition area or buffer of 150 feet. N.J.A.C. 7:7A-6.1 (d). He added that plaintiff's undeveloped site contains a thirty-acre plus spray irrigation field, with a 400 foot DEP-mandated buffer area around the field. McGroarty also noted that the Omni report prepared by plaintiff's expert, had concluded that the sewering of the undeveloped area was feasible, but required an additional 68.4 acre spray field with a 17.3 *720 acre lagoon. McGroarty observed that this field "would virtually eliminate the majority of [the] southern portion [of plaintiff's tract] for development." McGroarty concluded that only approximately twenty percent of plaintiff's former PUD tract could be developed because of these environmental constraints.
Coppola had a sharply differing view on the extent to which environmental factors constrained development on plaintiff's land. He cited a 1988 National Resources Inventory which concluded that a majority of plaintiff's vacant land was either deemed suitable for development or had "[l]imited [s]uitability" for development. He stated that only 215 acres were environmentally constrained because of wetlands, steep slopes, flood hazard area, and high aquifer recharge probability areas. However, he acknowledged that his computations were based on a map and other data prepared before the effective date of the more restrictive state wetland regulations, did not take into account the spray irrigation fields in the rezoned area and the DEP's requirement that there be a 400-foot buffer between a spray irrigation field and the nearest residence. McGroarty explained that the State's wetlands designations were far more extensive than shown on the federal national resource inventory, relied on by Coppola.
In challenging the five-acre zoning, plaintiff points to the fact that its property remained zoned R-3 (three units per acre) under the Township's 1986 master plan, and argues that since then there has been no significant change in environmental constraints affecting the property and land-use factors considered by the Township in 1986, remained relevant when the Township rezoned in 1995. Thus, plaintiff argues, the zoning amendments were arbitrary, capricious and unreasonable.
However, Lynch described in depth the history of the Township's zoning since 1972, and the factors considered by the Township in changing plaintiff's undeveloped tract first to R-A zoning and ultimately to RR-AA zoning. Lynch explained revisions of its zoning and master plan were put on "hold" until the Mount Laurel litigation was resolved in 1985. The Township revised its master plan and zoning ordinance in 1986, and in 1992, it appointed a committee to make an exhaustive "reexamination report" as required by the MLUL. As noted, when the Township ultimately decided to change the R-3 zone to R-A zone in 1995, it considered our decision in Manalapan Builders Alliance, supra, 256 N.J.Super. at 295, 606 A.2d 1132, which invalidated zoning ordinances excluding environmentally-sensitive areas from lot density calculations, because such calculations were contrary to the definition of "density" under N.J.S.A. 40:55D-4. Id. at 308, 606 A.2d 1132.
Moreover, Lynch testified that once the Township satisfied its Mount Laurel obligation in 1985, it was free to reduce density in order to control unchecked high-density zoning in environmentally constrained areas of the Township. When a municipality satisfies its fair share obligation, "the Mount Laurel doctrine will not restrict other measures, including large-lot and open area zoning, that would maintain its beauty and communal character." Mount Laurel II, supra, 92 N.J. at 220, 456 A.2d 390. A compliant municipality may implement large-lot zoning and also adopt regulations "with some regard to their fiscal obligations," so long as those measures bear a reasonable relationship to a legitimate governmental objective. Id. at 260, 456 A.2d 390.
Further, a major factor in Lynch's recommendation to rezone the property *721 for low intensity residential use was the lack of any reasonable prospect for expanding the treatment plant. Two engineering studies commissioned by plaintiff (Killam and Omni) indicated that a plant that would discharge treated sewage back into the south branch of the Raritan River would be very expensive and require state-of-the-art technology. Moreover, although the capacity of the existing plant had been increased from 250,000 gpd to 330,000 gpd, the Township's wastewater management plan, which did place plaintiff's property in a sewer service area, limited the permit to wastewater generated by existing units. Lynch concluded that the sewering of the rezoned area was problematical by virtue of severe conditions imposed by the DEP because of the proximity to the south branch of the Raritan River. Indeed, he noted that plaintiff had not taken any meaningful steps to acquire DEP approval for the construction of a sewer facility since 1988.[4]
Finally, Lynch testified that, in modifying the Township's zoning scheme after 1986, it relied heavily on the State Plan. As early as May 1989, Lynch advised the Township that low-density zoning would be more suitable and responsive to the "emerging State Plan." In 1995, McGroarty reported to the Township that the "most important concept" in the State Plan from the Township's perspective was "to concentrate most of the new development in areas already served by sanitary sewer, potable water, and modern roads or areas scheduled for reasonable expansions of such infrastructure," areas which the State Plan designated as "centers." Contrary to plaintiff's argument, these factors, considered singularly or in the aggregate, provided a rational basis for the Township to revisit its 1986 master plan and make appropriate changes to its zoning regulation.

IV
Of significance in this appeal is the extent to which a municipality may rely on the State Plan in redesigning its land use regulations. In redefining and in enforcing the Mount Laurel doctrine, the Court stated:
The Constitution of the State of New Jersey does not require bad planning. It does not require suburban spread. It does not require rural municipalities to encourage large scale housing developments. It does not require wasteful extension of roads and needless construction of sewer and water facilities for the out-migration of people from the cities and the suburbs. There is nothing in our Constitution that says that we cannot satisfy our constitutional obligation to provide lower income housing and, at the same time, plan the future of the state intelligently.
[Mount Laurel II, supra, 92 N.J. at 238, 456 A.2d 390.]
The State Plan, the successor to the State Development Guide Plan relied upon by the Court in Mount Laurel II, encourages sound land use management throughout the State through coordinated planning under the auspices of the State Planning Commission, which is charged with preparing the State Plan. New Jersey Builders Ass'n v. New Jersey Department of Envtl. *722 Prot., supra, 306 N.J.Super. at 96, 703 A.2d 323. Among other things, the State Plan "shall identify areas for growth, agriculture, open space conservation and other appropriate designations." N.J.S.A. 52:18A-199a. The FHA requires COAH to give "appropriate weight" to the State Plan. N.J.S.A. 52:27D-307. See Hills Dev. Co., supra, 103 N.J. at 32-33, 510 A.2d 621. In October 1992, COAH reached a memorandum of understanding with the State Planning Commission, under which COAH agreed that inclusionary development should be located in "centers," and that sites for affordable housing should be based on considerations of infrastructure availability and environmental sensitivity. N.J.A.C. 5:93, Appendix F. Consistent with the State Plan, COAH regulations generally disfavor inclusionary development in rural areas outside of centers. N.J.A.C. 5:93-5.4.
The State Plan is the product of the State Planning Act, N.J.S.A. 52:18A-196 to -207. The Act charges the State Planning Commission with the task of adopting and revising a State Plan providing for a "coordinated, integrated and comprehensive plan for the growth, development, renewal and conservation of the State and its regions and which shall identify areas for growth, agriculture, open space conservation and other appropriate designations." N.J.S.A. 52:18A-199a. The Commission is to coordinate planning activities and establish statewide objectives in enumerated areas of development with the goal of protecting natural resources and qualities of the State, including agricultural development areas, fresh and saltwater wetlands, flood plains, stream corridors, aquifer recharge areas, and steep slopes. N.J.S.A. 52:18A-200a.
A major goal of the State Plan is to halt suburban sprawl, characterized as a "pattern of development that destroys the character of the cultural landscape, is inefficient in terms of public facilities and services and devoid of the sense of place that has long defined the character of life in New Jersey." While the plan is not intended to validate or invalidate any municipal code or zoning ordinance, see N.J.A.C. 17:32-6.1(b), the MLUL has been amended to require municipalities to include within their master plans a statement indicating the relationship of the proposed development of the municipality to the State Plan. N.J.S.A. 40:55D-28d(3).
The Plan generally divides the State into five planning areas: area 1 (metropolitan or urban); area 2 (developed suburban); area 3 (fringe suburban); area 4 (rural); and area 5 (environmentally sensitive). Planning area 4B describes an environmentally-sensitive rural area, and "is meant to identify productive farmland that also contains valuable ecosystems or wildlife habitats." In both planning areas 4B and 5, development and infrastructure should be guided toward centers. Most of the RR-AA zone designation by the Township falls within planning area 5, with a small portion falling within planning area 4B. In addition, the amendments to the State Plan adopted on March 1, 2000, place the Township in the Highlands Special Resource Area recognized as "an area or region with unique characteristics or resources of statewide importance which are essential to the sustained well being and function of its own region and other regions or systems-environmental, economic, and social-and to the quality of life for future generations."
Coppola agreed that the State Plan was a "very significant factor" to be considered in a municipality's zoning decision. However, it was his opinion that plaintiff's PUD, approved in 1971, met all of the criteria for a "center" and, as currently developed, could qualify as a "village" under *723 the plan since it had some development and infrastructure. Lynch countered that planning area 5 "is essentially a no growth or low growth region and it is generally understood that utilities and services are not to be extended to serve development in these areas unless it is done in connection with the establishment of a center." Lynch stated that other areas of the Township are more appropriate for center designation, including Budd Lake, Flanders, and in the Hackettstown Sewer Authority watershed. We need not resolve the dispute between the experts regarding the "center" designation. Suffice it to say that the Township's adoption of Lynch's recommendations respecting "center" designation was a "defensible exercise of [its] legislative judgment." Bow & Arrow, supra, 63 N.J. at 343, 307 A.2d 563.
We do not hesitate to conclude that a municipality may consider and rely on the State Plan in redesigning its land use regulations. One respected land use authority suggests that they may.
The creation of the State Planning Commission is one, but only one, of the obvious shifts to planning on a state and regional level. This trend is likely to increase, particularly in view of the inability of local government to adequately deal with many major problems. Problems relating to such things as water pollution, solid waste disposal and wetlands regulations, to name just a few, transcend municipal boundaries, and recognition of this fact has resulted in statewide or regional legislation.
....
While many view with alarm the intrusion of the state into planning, and what they regard as interference with "home rule," an impartial observer can only conclude that the state has for too long operated without a cohesive plan. State government, as well as lower levels of government, should plan where state money will be spent to best advantage in terms of transportation system improvements and extensions, the approval of new sewerage systems and determination of the density of population which should be permitted in various areas. This is obviously beyond the planning abilities of municipal and even county governments; hence, we can expect an increased role in state and regional planning in the years to come.
[William M. Cox, New Jersey Zoning and Land Use Administration § 36-2 at 710-11 (Gann, 2000).]
As noted, recently, the executive branch has proposed strengthening the State Plan through regulations limiting new sewer service for planning areas 3, 4 and 5 to designated centers. 32 N.J.R. 2285, 2288-30 (July 3, 2000).[5] Currently pending in the Legislature are bills to accord a presumption of validity to municipal development regulations which have been deemed consistent with the State Plan, S. 1499, to amend the MLUL to state that a purpose of land use regulation is to promote compliance with the State Plan, A. 861, and a bill to prohibit state agencies from utilizing the State Plan as a basis for deciding whether to issue permits, A. 2691 and S. 114. An Assembly resolution has established a legislative commission to study the *724 State Plan and the FHA. A. Res. 158 (Dec. 11, 2000).
However, currently the State Plan has no regulatory effect and, unlike master plans, ordinances are not required to be submitted for review by the State Planning Commission. Beattystown Cmty. Council v. Department of Envtl. Prot., 313 N.J.Super. 236, 247, 712 A.2d 1170 (App. Div.1998), citing N.J.A.C. 17:32-7.1(a). Nevertheless, that is not to say that a municipality may not refer to the State Plan recommendations and guidelines in its legislative decision to rezone. Although the State Planning Act as presently structured does not require ordinances to be consistent with the State Plan, its very terms stress the importance of voluntary compliance. Were it otherwise, the MLUL would not have been amended to require municipal master plans to include a specific policy statement "indicating the relationship of the proposed development of the municipality, as developed in the master plan to ... the State Development and Redevelopment Plan...." N.J.S.A. 40:55D-28d(3). Moreover, the Act recognizes that New Jersey, as the nation's most densely populated State, requires sound and integrated statewide planning. N.J.S.A. 52:18A-196a. According to the Legislature, it was "of urgent importance" that the State Development Guide Plan be replaced by the State Plan "for use as a tool for assessing suitable locations for infrastructure, housing, economic growth and conservation." N.J.S.A. 52:18A-196c. Further:
Since the overwhelming majority of New Jersey land use planning and development review occurs at the local level, it is important to provide local governments in this State with the technical resources and guidance necessary to assist them in developing land use plans and procedures which are based on sound planning information and practice, and to facilitate the development of local plans which are consistent with State plans and programs.

[N.J.S.A. 52:18A-196f (emphasis added).]
Indeed, the Act can reasonably be deemed as a legislative redeclaration of many of the purposes of zoning set forth in the MLUL, including encouraging municipal actions
to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals and general welfare;... to ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole; ... [t]o promote establishment of appropriate population densities and concentrations; ... [t]o encourage the appropriate and efficient expenditure of public funds by the coordination of public development with land use policies;... [t]o promote the conservation of ... open spaces ... and valuable natural resources in the State; ... [and] ... to prevent urban sprawl and degradation of the environment through improper use of land[.]
[N.J.S.A. 40:55D-2a, d, e, f and j.]
Consequently, a municipality's voluntary adherence to the State Plan guidelines may support a determination that amendment to its zoning regulations advance the purposes of zoning defined by the MLUL. See Sod Farm Assocs. v. Springfield Township Planning Bd., 298 N.J.Super. 84, 86, 688 A.2d 1125 (Law Div.1995) (sustaining the rezoning of plaintiff's property to three-acre zoning in part because of the Township's reliance on the State Plan guidelines), aff'd, 297 N.J.Super. 584, *725 688 A.2d 1058 (App.Div.1996), certif. denied, 149 N.J. 36, 692 A.2d 49 (1997).
The rezoning of the undeveloped portion of plaintiff's tract was consistent with the standards and goals of the State Plan. Lynch testified that planning area 5, in which the undeveloped tract is situate, "is essentially a no growth or low growth region and it is generally understood that utilities and services are not be extended to serve development in these areas unless it is done in connection with the establishment of a center." The State Plan encourages limited development in planning area 5 in order to control suburban sprawl, limit areas where infrastructure should be extended, discourage additional development and redirect development toward areas where infrastructure already exists or is easily extended. Lynch explained that a major focus of the Township's planning efforts since 1992 has been to incorporate the recommendations of the State Plan and its concerns upon the impact of development upon critical environmental areas.
Lynch also testified that the rezoning was in keeping with the State Plan's recommendation that municipalities in planning areas 4 and 5 should not have a population density exceeding 1,000 people per square mile. Mount Olive Township has thirty square miles and therefore, according to the State Plan recommendation, its population should not exceed 30,000. Lynch noted that since current population of the Township is 28,000, much of that on developments occupying small lots, the Township's remaining undeveloped land should be zoned for large lots. Since the Township's rezoning of the RR-AA zone is consistent with the standards of the State Plan, and advances the purposes of zoning, we conclude that the trial court erred in declaring the RR-AA and RA-1 zones invalid.

V
Finally, the trial court's reference to the five-acre zoning as "enormous overkill" implies that it may have invalidated the ordinance at least in part because of its adverse economic impact on plaintiff. Plaintiff takes the argument one step further, contending that the zoning ordinance effectuates a taking of its property. The trial court rejected this point, concluding that plaintiff could make "substantial beneficial use" of the property.
Plaintiff presented the testimony of Richard Reading, who advanced the theory that the cost of land should not represent more than twenty-five percent of the total sales price of a single-family home, and, considering plaintiff's adjusted cost basis in the land, plaintiff would have to sell a single-family home for $1 million under the present zoning scheme. Reading claimed that there was no market for such homes in Mount Olive Township, and concluded that plaintiff could not achieve a reasonable return on its investment. Lynch responded that the price one paid for land should not influence zoning; for example, a 100 acre tract should not be zoned differently because the owner inherited it rather than pays too much for it. Lynch's opinion is consistent with prevailing law. In Albano, supra, 194 N.J.Super. at 277, 476 A.2d 852, we rejected a developer's claim that rezoning its property in neighboring Washington Township amounted to a regulatory taking, reasoning:
We do not doubt but that the zoning of property into idleness by restraint against all reasonable use would be invalid as confiscatory and would amount to a taking without compensation. AMG Associates v. Tp. of Springfield, 65 N.J. 101, 112, 319 A.2d 705 (1974). But that is not the case here. The zoning ordinance permits residential development of one unit per three acres, a *726 limitation on density necessary to control pollution of Lake George and to ensure proper treatment of sewerage. Plaintiffs presented evidence showing that development of the property as currently zoned would result in a loss to them. Even assuming that this is true, this evidence when examined in light of other factors does not establish that the property has been zoned into inutility. Plaintiffs' inability to make a profit may be traceable to a variety of reasons. Perhaps they paid too much money for the property for clearly the price they paid for the property greatly impacts on their opportunity to make a profit from its development. Poor investment and outside conditions occurring on and off the property can influence whether a property owner will profit from development or sale of the property. If a zoning ordinance could be invalidated simply because a developer could not make a profit under its terms, then by paying an unreasonably high price he could force a municipality to adopt a zoning ordinance permitting unsound development of its property. We conclude that in light of all the circumstances we cannot say the zoning ordinance precludes all reasonable uses of the property and thus we cannot hold a taking has occurred.
Our Supreme Court has held that a regulation promulgated by the Pinelands Commission that limited development to one home per forty acres, with a mandatory clustering option which allowed construction on one-acre lots and required the remaining thirty-nine acres to be permanently dedicated to agricultural use, was not a taking. Gardner v. New Jersey Pinelands Comm'n, 125 N.J. 193, 204, 593 A.2d 251 (1991). Government has a legitimate interest in protecting environmentally sensitive property and in promoting agriculture by preserving farmland. Id. at 205-06, 593 A.2d 251. No taking occurred simply by virtue of the diminished value of the land, nor its lack of marketability. Id. at 210, 593 A.2d 251. Plaintiff retained "several viable, economically-beneficial uses of his land" and there was no taking just because "those uses do not equal the former maximum value of the land ... for there exists no constitutional right to the most profitable use of property." Id. at 215, 593 A.2d 251.
Plaintiff's argument that the cluster option effectively zones a substantial portion of its property into inutility is without merit. As the Township argues, the property owner has the option to subdivide into five-acre lots or to build single-family homes on lots as small as one-and-a-half acres. Unlike in Gardner, a property owner in Mount Olive is not compelled to build on smaller lots and preserve the remaining property for agriculture or open space. Moreover, for taking purposes, the court views property under single ownership, acquired at around the same time, as a single economic unit, and therefore the test is whether the property as a whole has been zoned into inutility. Karam v. Department of Envtl. Prot., 308 N.J.Super. 225, 239, 705 A.2d 1221 (App.Div. 1998), aff'd o.b., 157 N.J. 187, 723 A.2d 943, cert. denied, 528 U.S. 814, 120 S.Ct. 51, 145 L.Ed.2d 45 (1999). This case does not involve the more difficult issue of whether a tract should be treated as one unit even though it has been segmented into smaller parcels at different times, and where the divided parcels have been considered as separate and distinct economic units. See East Cape May Assocs. v. Department of Envtl. Prot., 300 N.J.Super. 325, 693 A.2d 114 (App.Div.1997).
We conclude that the development restrictions imposed on plaintiff's property through the RR-AA zoning, while substantial, *727 are sustainable inasmuch as they advance a legitimate government purpose, are consistent with the State Plan and the MLUL, and do not deprive plaintiff of all reasonable use of its property.
The judgment denying plaintiff a builder's remedy is affirmed. The declaration that the Township's RR-AA zone is invalid is reversed.
NOTES
[1] Southern Burlington Cty. N.A.A.C.P. v. Township of Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I); Southern Burlington Cty. N.A.A.C.P. v. Township of Mount Laurel, 92 N.J. 158, 456 A.2d 390 (1983) (Mount Laurel II).
[2] These cases held that ordinances which exclude environmentally sensitive areas from lot size and floor area calculations are inconsistent with the Municipal Land Use Law. Manalapan Builders Alliance, Inc. v. Township Comm. of Manalapan, 256 N.J.Super. 295, 606 A.2d 1132 (App.Div.1992); Crow-New Jersey 32 Ltd. Partnership v. Township of Clinton, 718 F.Supp. 378 (D.N.J.1989).
[3] Revisions to the State Plan were adopted by the State Planning Commission on March 1, 2001. Its core tenets remain unchanged.
[4] A few weeks before trial, plaintiff retained an expert, Glenn Panaro, who testified that the existing plant could be expanded to 750,000 gpd without discharging into the south branch of the Raritan River. Panaro proposed a plan which would utilize infiltration percolation ponds in lieu of spray irrigation fields. He estimated that the facilities would occupy thirty acres or less. Moreover, the spray irrigation fields could be reclaimed and utilized for development. Panaro acknowledged, however, that there was no guarantee that DEP would approve such a facility.
[5] The proposal has generated much comment and controversy, and there is strong support in the Legislature for declaring the rule inconsistent with legislative intent. A. Con. Res. 124, adopted October 30, 2000; and S. Con. Res. 76. See, e.g. Thomas Jay Hall, A New Look at New Jersey's Land Acquisition Policy; Will the State Be Able to Protect 1 Million Acres from Development?, supra, 160 N.J.L.J. 1190; Peter A. Buchsbaum, The Growing Need to Achieve Consensus on Which Areas Should Be Designated for Growth, 160 N.J.L.J. 1193 (June 19, 2000).